ESTATE OF JOSEPH C. WILSON, DECEASED, LINCOLN FIRST BANK OF ROCHESTER, EXECUTOR, MARIE C. WILSON, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Wilson v. Commissioner
Docket No. 9766-75.
United States Tax Court
T.C. Memo 1977-312; 1977 Tax Ct. Memo LEXIS 129; 36 T.C.M. (CCH) 1230; T.C.M. (RIA) 770312; September 15, 1977, Filed H. Stewart Dunn, Jr.,Carol K. Nickel, Frederick W. Post,Edward R. Macomber, and William R. Reiter, for the petitioner. Stephen M. Miller, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in estate tax in the Estate of Joseph C. Wilson in the amount of $19,029,055.92. Certain minor issues raised by the pleadings have been abandoned or disposed of by agreement of the parties, leaving for decision the following: (1) Whether gifts of approximately $12 million made by decedent to his children in trust within 3 years of his death were transfers in contemplation of death within the meaning of section 2035, I.R.C. 1954. [1]
In the event the issue with respect to transfers in contemplation of death is decided for respondent, the following issues arise: (1) Whether, under New *131 York law, there was a direction in decedent's will against apportionment of estate and inheritance taxes to the trust created for the children; and (2) whether 30 annual payments of $335,800 to be made pursuant to a contract between decedent and the University of Rochester, which payments decedent appointed in his will to his surviving spouse, and certain real estate passing to his surviving spouse are burdened with payments of estate and inheritance taxes under decedent's will. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Joseph C. Wilson (sometimes referred to herein as decedent) died testate on November 22, 1971. Lincoln First Bank of Rochester (formerly Lincoln Rochester Trust Co.) and Marie C. Wilson, decedent's wife, were named as co-executors under Mr. Wilson's last will and testament executed on September 15, 1971, which was duly admitted to probate. Letters *132 testamentary were issued to Lincoln First Bank of Rochester (hereinafter Lincoln Bank) and Mrs. Wilson on December 15, 1971. Lincoln Bank is a corporation which had its principal place of business in Rochester, New York at the time of filing the petition herein. Marie C. Wilson, who is Mr. Wilson's surviving spouse, resided at Brighton, New York at the time of filing the petition herein.
A Federal estate tax return for the estate of Joseph C. Wilson was filed with the Internal Revenue Service Center at Andover, Massachusetts. Mr. Wilson died of a heart attack at the age of 61 on November 22, 1971, while attending a luncheon to celebrate his acceptance of the two-year chairmanship of the Governor's Club, a political fundraising organization for the benefit of the host of the luncheon, the then Governor of the State of New York, Nelson A. Rockefeller. At the time of his death, Mr. Wilson was chairman of the board of Xerox Corporation (Xerox). Mr. Wilson became president of Xerox on April 16, 1946, when he was 36 years old. He continued as president of Xerox until May 19, 1966. At that time he became chairman of the board of Xerox. When Mr. Wilson relinquished the presidency *133 of Xerox he was also the chief executive officer of Xerox. He retained that position until 1968 at which time C. Peter McColough, who had become president of Xerox when Mr. Wilson relinquished that post, also became the chief executive officer of Xerox. Mr. Wilson still held the position of chairman of the board of Xerox at the date of his death. Xerox had an established policy that longevity of an individual in a particular position was undesirable and regularly moved individuals into different positions. Mr. Wilson's relinquishment of the post of chief executive officer in 1968 was in accordance with that policy and with a further policy of Xerox that key operating posts in the company be relinquished by an individual prior to reaching the age of 60. Xerox was incorporated in 1906 as Haloid Company. Its name was changed to Haloid Xerox, Inc. in 1958 and to Xerox Corporation in 1961. The principal business of Xerox was the development, manufacture and marketing of business products, primarily xerographic copiers and duplicators, and related supplies and services. At the time Mr. Wilson became president of Xerox the company was primarily engaged in the photographic business. *134 It was under Mr. Wilson's leadership that the company began the commercial exploitation of xerographic equipment. In the early 1950's the xerographic equipment marketed by Xerox had limited market acceptance. Under Mr. Wilson's leadership Xerox's annual expenditures on research between 1954 and 1960 exceeded its profits, requiring that it borrow funds for its research undertaking. The research efforts during the late 1950's led to the introduction in March 1960 of the Model 914 Xerox copier.During the late 1950's, while the Model 914 copier was being developed, Mr. Wilson worked long hours, traveled extensively on company business, and was involved in every aspect of the business of Xerox. Just prior to the introduction of the 914 copier, Xerox had attempted to make arrangements for International Business Machines (IBM) to undertake the manufacture and marketing of the copier, but IBM refused to enter into such an agreement because its market study concluded that the 914 copier would not be a commercial success. Following the introduction of the 914 copier, Xerox's operating revenue increased from $33.3 million in 1959 to $1.5 billion in 1969. The market value of its stock *135 increased from $193 million in 1960 to $7.6 billion in 1969. In 1960 the median price of a share of Xerox stock was $3.55 per share and in 1969 it was $97.65 per share. On December 17, 1963, Xerox stock split 5 for 1, and on May 16, 1969, its stock split 3 for 1. Mr. Wilson was to a large extent responsible for the success of Xerox. After he relinquished the offices of president and chief executive officer, Mr. Wilson remained involved in the company's long-range planning, particularly with respect to negotiations for acquisitions. He participated with Mr. McColough, then the president and chief executive officer, in negotiations leading to the acquisition of a controlling interest in Rank Xerox Ltd., a United Kingdom corporation, and in an attempt to acquire C.I.T. Financial Corp. He also participated in the acquisition of Scientific Data Systems, Inc., a California computer company. During this period he traveled extensively in this country and abroad in connection with the business of Xerox. He always presided at the board meetings of Xerox and participated in making recommendations to the board. On the evening preceding his death, Mr. Wilson had a long distance telephone *136 discussion with Mr. McColough concerning long-range plans of Xerox, and on the morning of the day of his death he attended a Xerox management meeting. After relinquishing the positions of president and chief executive officer of Xerox, Mr. Wilson continued to maintain an office and staff of three people at Xerox headquarters and spent time in his office every work day whenever he was in Rochester. When he was away from Rochester, important mail which came to his office at Xerox would be sent to him, if possible, so that he could mail back to the office responses or instructions. In addition to the time Mr. Wilson spent in his office at Xerox, he often did work at his home in connection with Xerox's business. Between 1968 and the date of his death, Mr. Wilson served actively on the boards of directors of First National City Bank of New York, American Can Company, R. T. French Company, Fuji Xerox Company, Rank Organization, Ltd. and Rank Xerox, Ltd., Lincoln Rochester Trust Company, Massachusetts Mutual Life Insurance Company, McCurdy & Co., Rochester Gas and Electric Corporation, and Rochester Savings Bank. Mr. Wilson always attended the meetings of the boards of directors *137 of companies on which he served as a member whenever he was not away from Rochester on business connected with Xerox. In addition to his business undertakings, Mr. Wilson during the years 1966 to the time of his death served actively on a number of public commissions and as an officer or director of a number of philanthropic and educational organizations. He served in 1967 as chairman of the Arden House Conference, dealing with the problems of public welfare. He actively participated in all phases of the work of this conference and in the publication of its report. Mr. Wilson served with the Committee for Economic Development and as chairman of a subcommittee of the Council of Economic Development which was to continue the work of the Arden House Conference. He actively participated in this work and in the publication of its report. Mr. Wilson also chaired the Governor's Steering Committee on Social Problems and at the request of several members of a Senate Subcommittee chaired a committee to study the merits of various legislative proposals encouraging black capitalism. He presided over a public hearing conducted by this committee on April 17, 1969. In connection with the *138 work of this committee and certain of its proposals, Mr. Wilson testified in October 1969 before the House Ways and Means Committee and the Senate Finance Committee. In September 1971 he accepted the chairmanship of the President's Health Committee and had, prior to his death, agreed to preside over public hearings to be held by this committee in January 1972. In June 1971 Mr. Wilson agreed to become chairman of a subcommittee of the Council of Economic Development which was to undertake a detailed study of the financing of the nation's health care system, and also in 1971 he agreed to chair a committee which was made up of individuals who had participated in the Governor's Steering Committee on Social Problems. This committee mittee was to study urban problems. Mr. Wilson actively participated in the work of all the various committees on which he served. In 1959 Mr. Wilson became chairman of the board of trustees of the University of Rochester. Mr. Wilson was an alumnus of the University and had been selected as a member of Phi Beta Kappa when he graduated. In 1962 he was persuaded to continue as chairman for 5 years, and in 1967 he resigned that post. After resignation *139 as chairman of the board of trustees of the University of Rochester, he continued to serve as a trustee and to participate actively in the affairs of the University. Mr. Wilson was chairman of the University's $38 million Capital Fund-Raising Drive at the time he resigned as chairman of the board of trustees, and he continued to hold this position until the drive terminated in 1968. In connection with his work with the Capital Fund-Raising Drive, Mr. Wilson frequently traveled throughout the country speaking to various alumni groups and making fund-raising calls on corporations. During 1965 and 1966 Mr. Wilson was first vice president of the Community Chest of Rochester and Monroe County, Inc. During 1967 and 1968 he was president of the Community Chest. Mr. Wilson actively worked many hours in connection with the offices he held with the Community Chest. At Mr. Wilson's suggestion a consulting firm was engaged to do a study of the areas where the maximum possible benefits to the community might be achieved through expenditures of Community Chest funds. When the report from this study was published, Mr. Wilson agreed in March 1971 to chair a committee to study the report and *140 suggest how it should be implemented. During the summer and fall of 1971 Mr. Wilson personally contacted the 45 individuals who were asked to serve on this committee. Between late 1967 and early 1970 Mr. Wilson was chairman of the Metropolitan Housing Committee in Rochester. This committee worked with low and middle income housing development, and Mr. Wilson actively participated in this work. Beginning in 1969 Mr. Wilson actively participated in connection with fundraising activities of the Joslin Diabetes Foundation of Boston. Mr. Wilson first had contact with this foundation while seeking treatment for one of his daughters who had developed eye complications as a result of diabetes. Also, between 1968 and 1971 Mr. Wilson was a trustee for the Committee of Economic Development, a director of the Council of Financial Aid to Education, a trustee and treasurer of the George Eastman House, a trustee of the National Conference of Christians and Jews, a director and chairman of the Executive Committee of the Sydney Hillman Health Center of Rochester, a trustee of the Alfred P. Sloan Foundation, a director of the United Nations Association of the United States of America, a *141 trustee of the Carnegie Endowment for International Peace, and a member of the Harvard University Visiting Committee for the Graduate School of Business Administration from which he had received his master's degree in 1932. From 1947 until his death in November 1971 Mr. Wilson's doctor was Dr. L. Pulsifer. During this period Mr. Wilson saw Dr. Pulsifer at regular intervals, many of his visits being for periodical physical checkups. In 1952 Mr. Wilson suffered a coronary occulsion with a probable myocardial infarction, which is commonly referred to as a heart attack. A coronary occlusion occurs when an artery does not supply blood to the heart muscle because of blockage in one of the arteries to the heart. A myocardial infarction is damage to the heart muscle usually resulting from interference in the blood circulation caused by the failure of the coronary arteries. At the time of his heart attack in 1952 Mr. Wilson was not hospitalized but remained at home resting for several weeks. An electrocardiogram test taken while Mr. Wilson was recovering from the heart attack sustained in 1952 and tests taken thereafter, including one taken in 1968, gave no evidence of any damage to *142 his heart. From time to time after his heart attack in 1952 Mr. Wilson suffered attacks of angina pectoris. These attacks were generally brought on by exercise, fatigue, emotional strain or cold' weather. Angina is a discomfort in the chest which usually occurs when the heart muscle is denied enough blood for its needs under the particular circumstances and is sometimes connected with a coronary occlusion. In the years following his heart attack in 1952 the angina attacks experienced by Mr. Wilson became less and less frequent. He had only one attack of angina between August 1968 and September 1969. A person who has suffered one coronary occlusion or myocardial infarction is more likely to suffer another such attack than is a person who has never suffered such an attack. Dr. Pulsifer, in accordance with his normal practice of explaining medical situations to his patients, explained this fact to Mr. Wilson. After Mr. Wilson's heart attack Dr. Pulsifer advised him to live a less aggressive, less active life and from time to time thereafter advised Mr. Wilson to begin relinquishing some of his duties and business activities, to take on less and not cover so much ground. However, *143 Dr. Pulsifer never advised Mr. Wilson that any serious consequences to his health would follow if he did not alter the pace of his life. In a visit Mr. Wilson made to Dr. Pulsifer on June 29, 1964, Dr. Pulsifer, for the second time, recommended to Mr. Wilson that he see Dr. Paul Yu, a well known cardiologist at the University of Rochester. At the time of a physical examination of Mr. Wilson on December 19, 1960, Dr. Pulsifer had recommended to Mr. Wilson that he limit his drinking to one or two drinks per week. At that time Mr. Wilson was tired, jittery and sleepless, and Dr. Pulsifer felt that he might be using drink as a medicine to calm himself down. In addition to regular physical examinations, the medical problems about which Mr. Wilson consulted Dr. Pulsifer included a keratosis on the back of his hand in 1957. At Dr. Pulsifer's suggestion Mr. Wilson had the growth surgically removed since many such growths eventually become malignant. Mr. Wilson also suffered from chronic perianal trouble. He had had this condition for years and was continuously treated for it by Dr. Pulsifer. At the time of his physical examination in December 1960 the results of Mr. Wilson's blood *144 tests showed a cholesterol level of 290. Dr. higher than preferred and that he should be careful to avoid animal fats. Dr. Pulsifer advised Mr. Wilson that he should bring his cholesterol level down. Mr. Wilson did bring the level down, and thereafter his blood examination did not show a cholesterol level in excess of 250. On February 27, 1963, Dr. Pulsifer discovered that Mr. Wilson had a hernia condition. In his examination of Mr. Wilson on June 29, 1964, Dr. Pulsifer found this condition more prominent. In October 1966, upon finding the hernia had become even more prominent, Dr. Pulsifer arranged for Mr. Wilson to have an operation. The operation was successful, and Mr. Wilson had no further difficulty with this condition. On April 22, 1966, while examining Mr. Wilson, Dr. Pulsifer discovered a lump on Mr. Wilson's shoulder which Mr. Wilson had surgically removed without hospitalization. In August 1968 Dr. Pulsifer found that Mr. Wilson continued to suffer from rectal bleeding and recommended on September 16, 1968, that Mr. Wilson take some additional tests for this problem. This further rectal examination showed no adverse results. The electrocardiogram test given *145 to Mr. Wilson during his medical examination in August 1968 was normal. This examination was the last medical examination Mr. Wilson had prior to March 6, 1969. Dr. Pulsifer considered Mr. Wilson to be a very tense but contained person who would always appear calm even when he "churned hard" about things. While Mr. Wilson talked freely with Dr. Pulsifer about his activities and feelings, as well as his fears and anxieties, Dr. Pulsifer believed that Mr. Wilson had very few confidants and did not exhibit his fears or anxieties to other people. Dr. Pulsifer considered Mr. Wilson to be a man who kept his own counsel and, other than the conversations he and Dr. Pulsifer had, would be unlikely to have discussed either personal or health problems with another person even though he was a very good friend. However, in September of 1969 in a conversation with an officer of Xerox who had recently suffered a heart attack, Mr. Wilson stated that he had a similar attack in 1952 and was "here" and "fine." He stated to this individual that he should not worry about his attack, that it was a warning that perhaps he should change his lifestyle a little, take things a little easier, and make *146 sure he did not get exhausted. From time to time Mr. Wilson and Dr. Pulsifer had long talks about Mr. Wilson's activities and strain. In a visit to Dr. Pulsifer on March 8, 1967, Mr. Wilson stated that he had been under severe pressure for nearly a year. He stated that he was short with people, impatient and tired, and had had two angina attacks which had been induced by exercise and exposure to cold, and had been relieved by nitroglycerine. On this occasion Dr. Pulsifer had a long talk with Mr. Wilson and stressed to him the importance of his giving up some of his activities.Dr. Pulsifer told Mr. Wilson that all the activities in which he was engaged were wearing him out and that he should relinquish some of them so that he would not be as tired, wakeful at night and impatient. When Mr. Wilson visited Dr. Pulsifer on August 20, 1967, he again stated that he had been under business stress for weeks. He stated that he had too many extracurricular activities and no longer had the same zest to get into things and was feeling the pressure of his environment. Mr. Wilson and Dr. Pulsifer discussed Mr. Wilson's business stresses, the fact that he was reading during the night and *147 his involvement in business activities. Dr. Pulsifer then gave Mr. Wilson 8 valium tablets to assist him in sleeping and a few months later gave him a prescription for 50 such tablets which could be refilled 5 times. Valium is a commonly used mild tranquilizer. After Dr. Pulsifer prescribed this tranquilizer for Mr. Wilson, he used it only once or twice a month. On September 24, 1962, the Hamilton Life Insurance Company of New York (now Union Mutual Stock Life Insurance Company of New York) issued a $100,000 policy on Mr. Wilson's life at the standard premium rate, and on June 13, 1963, the same company issued a $400,000 policy on Mr. Wilson's life at the standard premium rate. In connection with applying for each of these policies Mr. Wilson was given a physical examination by two different doctors. In both 1962 and 1963 both doctors reported that Mr. Wilson's heart and general medical condition were normal and that the results of an electrocardiogram and stress test taken in connection with the examination indicated a normal heart. Xerox never applied for, nor obtained, any insurance policy of any type from either Hamilton Life Insurance Company or the Union Mutual Stock *148 Life Insurance Company. Over the period 1961 until the time of his death Mr. Wilson consistently made charitable contributions. On August 4, 1965, he created a trust for the University of Rochester to which he transferred 30,000 shares of Xerox stock (not adjusted for the 3 for 1 split of May 16, 1969) valued at $4,811,250. Under the terms of the trust agreement, Mr. Wilson retained a life interest in the trust income and reserved a second succeeding life income interest to Mrs. Wilson if she survived that could be revoked by Mr. Wilson. The remainder passed outright to the University upon the death of the survivor. On May 5, 1967, Mr. Wilson transferred to this trust 50,000 additional Xerox shares (not adjusted for the 3 for 1 split of May 16, 1969) worth $14,834,375. Mr. Wilson expressed to the chancellor of the University his desire that the University immediately begin making expenditures based on the actuarial value of the University's remainder interest in his gift to the University. This request was in line with the general philosophy he had expressed and had influenced the University to adopt when he served on its board of trustees that the University not limit its *149 expenditures for a particular year to the income generated in that year by the endowment, but rather expend a portion of the endowment corpus based on a 5-year average capital value when such expenditure was necessary to finance worthy projects of the University. Shortly after the death of the Rev. Martin Luther King in 1968, Mr. and Mrs. Wilson contributed Xerox stock valued at $250,000 for the purpose of creating a special purpose fund at the Community Chest to be known as the Martin Luther King Fund. Mr. Wilson informed officials of the Community Chest that it was his desire that the fund be used to provide the initial investment for construction of low income housing in the Rochester area. Mr. Wilson worked on behalf of the fund, writing letters to other persons who might be interested in making similar contributions, and an additional $550,000 was contributed to the fund. In addition to the above-described gifts, Mr. Wilson made additional charitable contributions of approximately $725,000 between 1961 and the date of his death, including some contributions to the Joslin Diabetes Foundation.On April 26, 1971, Mr. Wilson informed the Joslin Diabetes Foundation that it was *150 his intention that the Joseph C. and Marie C. Wilson Foundation contribute at least $1 million of Xerox stock to the Joslin Diabetes Foundation over the next 5 years. Mr. and Mrs. Wilson were married in 1935. They had six children whose names and birth dates are as follows: Children
Date of Birth
Joan Wilson Dalbey (married 6/23/60)
3/20/38
Joseph Richard Wilson (married 11/1/62)
1/03/41
Katherine Wilson Kling (married 8/21/65)
6/05/43
Judith Anne Wilson
4/19/49
Deirdre Wilson
1/04/51
Janet Christine Wilson
4/09/53
As of March 6, 1969, Mr. and Mrs. Wilson had the following children-in-law and grandchildren: Children-in-Law
Date of Birth
Thomas Dalbey (husband of Joan)
10/29/37
Roberta Wilson (wife of Joseph Richard)
4/07/40
Christian Kling (husband of Katherine)
7/07/38
Grandchildren
Marie Overton Dalbey
4/23/61
Katherine Dalbey
7/10/63
Deirdre Hart Wilson
2/12/64
Breckenridge W. Kling
7/19/66
Joseph Robert Wilson
7/26/66
Ronald Thomas Dalbey, Jr.
3/01/67
Richard Scott Wilson
9/18/68
Mr. and Mrs. Wilson had the following grandchildren born after March 6, 1969, on the dates indicated: Grandchildren
Date of Birth
Joan Wilson Dalbey
4/03/69
Christian Garrett Kling, II
7/18/69
Kerry Lee Wilson
6/09/70
Barclay Curran Kling
11/22/70
*151 On September 5, 1970, Deirdre Wilson married Joseph Garton. Mr. and Mrs. Wilson maintained a close relationship with their children and took an active interest in the activities in which their children were involved. The Wilson family took a number of vacations together, both within the United States and in Europe. In 1964 the family took a trip to England.Also in 1964 Mr. Wilson purchased a vacation home in Florida which was used by Mr. and Mrs. Wilson and by their children and their children's families. In 1967 Mr. Wilson built a vacation home with a tennis court on Canandaigua Lake in Bristol Hills, New York. This home was used frequently as a weekend retreat for the Wilsons and also for vacation trips by the Wilson children. In April 1969 the Wilsons began planning a vacation trip to Greece and a cruise through the Greek Isles, but the trip was not taken because of the illness of their daughter Christine. A trip to Africa, planned by the Wilsons for 1971, was canceled because they decided they wanted to be at home when Christine left for college. Mr. and Mrs. Wilson went on a yacht cruise through the Greek Islands in October 1971. Mr. Wilson appeared to the people *152 accompanying him on this trip to be in excellent spirits and full of enthusiasm. While on the cruise through the Greek Islands in October 1971, Mr. Wilson began planning for future vacation trips to the South Sea Islands, the Orient, Europe and the Mediterranean. At the time of Mr. Wilson's death, arrangements had been made with a travel agency for a trip to the Far East. Mr. Wilson's father, Joseph R. Wilson, died of a heart attack and stroke on December 12, 1962, at the age of 80. His will, dated May 5, 1959, provided in part for a trust consisting of the residue of his estate. The income of the trust was to be paid to his wife for life if she survived him and, upon her death, the corpus was to be divided into two parts. One part was to be divided into as many shares as there were children of Joseph C. Wilson, the decedent here, then living and deceased children leaving issue then living. The trust further provided that the amount was to be held by the trustee in separate trusts (1) to apply the income from the trust of any child who had not reached the age of 21 years to the use, care, maintenance and education of such child and to accumulate any excess of such income *153 and to invest and reinvest the same, and (2) to pay the accumulated income to such child when he or she reached the age of 21 years, and thereafter to pay the income to such child in periodic payments until such child attained the age of 45 years, at which time the principal balance of the trust fund was to be paid over to the child. This trust created by the will of Joseph R. Wilson further provided with respect to the trusts: In lieu of the distribution of income as heretofore stated, the trustees are authorized and empowered, in their sole and absolute discretion, to pay or apply the income or principal of any one or more of the aforesaid trusts (for the benefit of the children of JOSEPH C. WILSON), during the continuance of such trust or trusts, in such amounts and proportions as my said trustees may determine for the use of the beneficiary of any other such trust or for the benefit of my son, JOSEPH C. WILSON, or his wife, MARIE CURRAN WILSON, in the event that the trustees shall, in their sole and absolute discretion, deem that such diversion is advisable from time to time without regard to equality of distribution. Any income not so disbursed shall be distributed in accordance *154 with the provisions of the separate trusts hereinbefore stated. The trustees under the will of Joseph R. Wilson were Joseph C. Wilson (decedent), Richard U. Wilson, and Lincoln Bank. On July 3, 1968, Mr. Wilson's mother, Katherine M. Wilson, executed a trust for the benefit of Mr. Wilson's children which provided for the creation of separate trust shares for each child. The income of each share was to be accumulated until the child reached the age of 21. After the child reached the age of 21, the trustee was directed to pay, at least quarter-annually, to or for the benefit of the child or his issue so much of the trust income, and in such proportions, as the trustee in its sole and absolute discretion deemed advisable for the best interest of the beneficiaries. The trust also authorized payment to the child of so much of the trust principal as the trustee in its sole and absolute discretion determined necessary for the proper maintenance, support or education of such child or of his or her dependent children. The children were also given a noncumulative power to withdraw annually $5,000 of trust principal after the age of 21 years. The trustee of this trust was the Lincoln *155 Bank. On the same date that Katherine M. Wilson executed the trust, she executed a will which provided in part that the residue of her estate be divided into two parts. One part, entitled "Joseph C. Wilson Family Part," provided for a gift of 25,000 shares of Xerox stock, but not to exceed in total value $500,000, to the University of Rochester. The remainder of the Joseph C. Wilson Family Part was to be divided into as many shares as there were surviving children of Joseph C. Wilson or deceased children leaving issue then surviving. The will provided that the trustees were to pay to each child of Joseph C. Wilson in quarterly or more frequent installments the net income from his or her share or, in the trustees' sole discretion, to apply the same to such child's use, benefit, support and education until he or she reached the age of 35 years, whereupon the trust would terminate and the trust principal would be distributed to the child. The trustees had the power to accumulate income at their discretion, adding that income to principal, and the power to apply the income to or for the issue of a beneficiary of another share. The trustees under the trust created by the will of *156 Katherine M. Wilson were Joseph C. Wilson (decedent), Richard U. Wilson and the Lincoln Bank. Katherine M. Wilson died of a form of heart disease associated with old age on July 15, 1968, at the age of 86. As of February 1969, Mrs. Katherine M. Wilson's estate was still under administration.The estimated amount of the residue of that estate to go into the Joseph C. Wilson Family Part trust, after payment of the $500,000 legacy to the University of Rochester, was $1,611,000, or $268,500 for each of the six trust shares provided for under the will. Each of the six trusts created by the will of Joseph R. Wilson, of which Katherine M. Wilson was life income beneficiary, had a market value as of July 1968 of $1,117,600 and an estimated annual income of $25,000. As of July 3, 1968, the market value of each of the six trusts created by Katherine M. Wilson under the inter vivos trust agreement of July 3, 1968, was $333,786.06 and the estimated annual income was $1,800. The estate planning division of Lincoln Bank prepared a document for Mr. Wilson entitled "Tax Considerations for Making Substantial Gifts to Children of Xerox Stock (Revised 9/14/61) Joseph C. Wilson" under date of *157 September 14, 1961. The purpose of the study as set forth in the document was to determine the estimated costs and capital gains taxes of proposed gifts and the effect completion of these gifts would have on estimated future estate taxes and expenses of administration, and also to determine whether the proposed gifts would result in larger amounts of property going to Mr. Wilson's descendants. In late 1961 the approximate total value of Mr. Wilson's estate was $8,500,000. The document prepared by the Lincoln Bank set forth various calculations showing how estate taxes could be minimized and the property going to Mr. Wilson's descendants enlarged. The document prepared by the Lincoln Bank listed certain possible disadvantages of entering into a gift program. These included the fact that trusts established at that time could not last as long as trusts established at a later date when more "measuring lives" would be "in being," and the document stated: This thesis would support delay. The antithesis is that delay increases the hazards of gifts made "in contemplation of death", and probable appreciation in the value of the stock. The bank further pointed out that the making of *158 sizable gifts would require heavy gift and probably also capital gains taxes, but further pointed out that these, in the aggregate, are less than the equivalent of estate taxes and administration expenses. The memorandum then concluded that under Mr. Wilson's situation none of the disadvantages were significant and the advantages of transferring the property at gift tax rates rather than by testamentary disposition at estate tax rates seemed to apply in Mr. Wilson's situation. Mr. Wilson executed two irrevocable trust instruments, designated as Trust A and Trust B, each creating separate trusts for each of his six children and their issue on December 20, 1961. The corpus of each A trust contained 60 shares of Xerox common stock, and the corpus of each B trust contained 40 shares, in each instance without consideration of the stock splits on December 17, 1963 and May 16, 1969.The total market value as of December 20, 1961, of the stock given to the six A trusts was $55,035, and the total market value of the stock given to the six B trusts was $36,690.The Lincoln Bank served as trustee of Trust A and Trust B.
Trust A provided for the trustee to hold each separate part for each *159 of the children in a separate trust and to distribute the income and principal as follows: A.The Trustee shall pay to such child the net income therefrom in quarterannual installments during his or her lifetime.
B. Upon the death of such child, the Trustee shall transfer and pay over the trust principal to or among the spouse, issue of such child or to the brother or sisters of such child, or their issue, or to any one or more of them, in such shares and in such manner whether outright, in trust or otherwise, as such child may appoint by written instrument or by his or her Last Will and Testament * * *. Trust A provided that, absent the exercise of this power of appointment, the trust principal was to pass to the child's issue. There was no provision in the trust instrument for invasion of the principal either by or for the benefit of any child, or for the distribution at any time of the principal to a child. Trust B contained provisions substantially similar to those in Trust A except that the provision with respect to the disposition of trust income was as follows: A. The Trustee shall accumulate the income therefrom during such child's minority and upon attaining the *160 age of twenty-one years shall pay to him or her such accumulated income, and after such child shall have attained the age of twenty-one years, the Trustee shall pay to such child the net income therefrom in quarterannual installments or apply the same to the use and benefit of such child during his or her lifetime, with power in the Trustee to accumulate the income therefrom after such child has reached the age of twenty-one years if such accumulation shall, in the absolute discretion of the Trustee, be deemed for the best interests of such child. These gifts in trust, which Mr. Wilson made on December 20, 1961, were made as Christmas presents to his children. In addition, during the year 1961 Mr. Wilson gave his children cash in the following amounts: Joan
$1,890
J. Richard
2,000
Katherine
2,000
Judith
2,000
Deirdre
2,000
Janet
2,000 The total value of the gifts by Mr. Wilson to his children in 1961 was $103,615. As Christmas gifts to his children in 1962, Mr. Wilson added 55 shares of Xerox stock to each of the A trusts for the benefit of Katherine, Judith, Deirdre and Janet, each 55 shares having a market value of $8,284.38, and added 30 shares *161 to each of the A trusts for the benefit of Joan and Richard, each 30 shares having a market value of $4,518.75. After the split of Xerox stock in 1963 and 1969, the total number of shares given in 1962 had grown to 4,200 shares. In addition to these Christmas gifts of stock, Mr. Wilson gave Joan and Richard cash in 1962 in the amounts of $2,487 and $4,944, respectively. The total of the gifts made by Mr. Wilson to his children in 1962 was $49,606.02. In 1963 Mr. Wilson, as Christmas gifts to his children, added 75 shares of Xerox stock to Trust A for each child's benefit, each 75 shares having a market value of $5,995.31. As a result of the 1969 split of Xerox stock, the total number of shares given to Trust A in 1963 grew to 1,350. Although Mr. Wilson made some gifts to his grandchildren in 1963, he made no gifts to his children other than the Christmas gifts of Xerox stock added to Trust A. The total of the gifts made by Mr. Wilson to his children in 1963 was $35,971.86. As Christmas gifts in 1964, Mr. Wilson added 62 shares of Xerox stock to Trust A for the benefit of each of his children, each 62 shares having a market value of $5,948.13. As a result of the 1969 stock *162 split, the total number of shares given to Trust A in 1964 grew to 1,116. In addition to the Christmas gifts of Xerox stock, Mr. Wilson in 1964 gave his daughter Joan rights to subscribe to Xerox stock valued at $6,503.75 and gave to each of his other five children rights to subscribe to Xerox stock valued at $7,003.75. The total amount of gifts made by Mr. Wilson to or for the benefit of his children in 1964 was $77,211.28. In addition, Mr. Wilson made gifts in the year 1964 to his grandchildren. Mr. Wilson's net worth in 1964 was between $25 million and $30 million.
As Christmas gifts in 1965, Mr. Wilson added 30 shares of Xerox stock to Trust A for the benefit of each of his children, each 30 shares having a market value of $5,962.50. As a result of the 1969 split of Xerox stock, the total number of shares given to Trust A in 1965 grew to 540. In addition to the gifts of Xerox stock, Mr. Wilson in 1965 gave Katherine $2,942.50, Judith $1,249.60, Deirdre $1,220.40, and Janet $2,998.40, making total gifts to or for the benefit of his children in 1965 of $44,185.90. Mr. Wilson's net worth in 1965, after the gift in trust for Rochester University previously described, aggregated *163 approximately $34 million. In December 1966 Mr. Wilson, as Christmas gifts to his children, added 28 shares of Xerox stock to Trust A for each child's benefit. Each 28 shares had a market value at the date of gift of $6,179.25. As a result of the 1969 Xerox stock split, the total number of shares given to the trusts in 1966 grew to 504. In addition to the Christmas gifts of Xerox stock to the trust of each of his children, Mr. Wilson in 1966 made cash payments for insurance premiums on the lives of his four youngest daughters in the total amount of $6,910.90, making a total of $43,626.40 as gifts to or for the benefit of his children in 1966. In addition in 1966, Mr. Wilson made gifts to his grandchildren. Mr. Wilson's net worth in 1966 was approximately $35 million. In December 1967, as Christmas gifts, Mr. Wilson added 20 shares of Xerox stock to Trust A for the benefit of each of his daughters, Judith, Janet and Dirdre, each 20 shares of stock having a market value of $6,080. As a result of the 1969 Xerox stock split, the total number of such shares given to the trusts in 1967 grew to 180. In addition, Mr. Wilson made cash payments for insurance premiums in 1967 on the *164 lives of his four youngest daughters in the total amount of $6,910.90 and made cash payments and gifts of furniture to his three oldest children, who were then married, in the total amount of $22,701.50. The total amount of gifts which Mr. Wilson made to his children in 1967 was thus $47,856.40. In addition, during 1967 Mr. Wilson made gifts to his grandchildren. Mr. Wilson's net worth in 1967, after the additional gift of 50,000 Xerox shares to the University of Rochester trust previously described, was approximately $37 million. In December 1968, as Christmas gifts, Mr. Wilson added 22 shares of Xerox stock to Trust A for the benefit of each of his children, each 22 shares having a market value of $6,003.25. As a result of the 1969 stock split, the total number of shares given to the trust in December 1968 grew to 396. In addition, Mr. Wilson made cash gifts and gifts of furniture to his children in 1968 in the total amount of $65,334,50. The total amount of gifts given to or for the benefit of his children in 1968 was $101,354. In addition in 1968, Mr. Wilson made gifts of Xerox stock to the spouses of his children and to custodial accounts for his grandchildren. In the *165 latter part of 1968 Mr. Wilson's net worth was approximately $35 million. As of October 1968 the market value of each of the six A trusts for Mr. Wilson's children was $839,854.89, and the estimated annual income from each trust was $7,374.40. The market value as of October 1968 of each of the six B trusts established in December 1961 for Mr. Wilson's children was $54,049.31 and the estimated annual income of each trust was $321.60. The following schedule shows the income and source of income reported by Richard and Roberta Wilson on their Federal income tax returns for the years 1966 through 1969: Gross
Richard's
Trust Year
Income
Wages
Income
1966
$14,316
$10,231
$1,561
1967
18,144
12,360
2,229
1968
21,612
16,088
2,040
1969
24,111
17,524
1,704
The total income for the years 1966 through 1969 reported by Joan and Tom Dalbey on their Federal income tax returns was as follows: Gross
Tom's
Trust Year
Income
Wages
Income
1966
$46,014
$42,570
$1,561
1967
53,279
47,040
2,229
1968
72,233
50,040
2,050
1969
73,948
62,263
1,875
For the years 1966 through 1969 the total income reported *166 by Katherine and Christian Kling on their Federal income tax returns was as follows: Gross
Christian's
Trust Year
Income
Wages
Income
1966
$ 5,087
$ 962
$1,633
1967
5,353
-0-
2,327
1968
13,483
77
2,174
1969
37,930
27,296
6,772
The Richard Wilsons, the Dalbeys, and the Klings, in addition to salary and trust income, also had income from dividends each year. [3]
In addition to making gifts to his children during the years 1961 through 1968, Mr. Wilson also lent money to his children or their spouses to assist them in purchasing *167 homes or in business enterprises. On May 21, 1968, Mr. Wilson lent Joan Wilson Dalbey and her husband $105,000 to purchase a home. On the date of Mr. Wilson's death, $93,300 of this loan was outstanding. Between 1968 and 1971 Mr. Wilson made three loans to Katherine Wilson Kling and her husband for the purchase of homes for their family. In August 1968 he lent the Klings $34,000 of which $30,100 was outstanding at the date of Mr. Wilson's death. In February 1971 he lent them $9,000 and in May 1971 lent them $140,000. Both of these loans were outstanding at the date of Mr. Wilson's death. On May 21, 1968, Mr. Wilson lent Richard and Roberta Wilson $130,000 to purchase a home. On the date of Mr. Wilson's death, $118,300 of this loan was outstanding. When Christian Kling married Mr. Wilson's daughter Katherine in 1965 he was employed by an investment banking firm in New York and was going to night school at New York University working toward a Ph. D. After discussions with Mr. Wilson and after receiving his encouragement, Christian Kling resigned from his job and enrolled in a fulltime doctorate program, first at Columbia University and later at the University of Michigan. *168 During the years 1966 through 1968 while Christian Kling was working on his Ph. D. degree, Mr. Wilson lent the Klings approximately $1,000 a month, or a total of $40,000, for living expenses. At the date of Mr. Wilson's death, the amount of $30,000 of these loans was still outstanding. Mr. Kling received his doctorate in the late 1960's and the Klings returned to Rochester to live. Mr. Kling initially started a small investment banking business but later went into teaching, with the encouragement of Mr. Wilson. After consulting with Mr. Wilson, Tom Dalbey in 1962 or 1963 took a position with the Robert Hart Printing Company. In 1965 he became interested in going into business for himself and was interested in purchasing the T. H. Green Electrical Company in Rochester. Mr. Wilson made a loan of $200,000 to the T. H. Green Electrical Company to enable his son-in-law, Tom, to complete the purchase of the company. A note was executed by the electrical company to Mr. Wilson for the $200,000, carrying a fluctuating rate of interest. In 1970 Tom Dalbey sold T. H. Green Electrical Company and the 1965 loan was repaid to Mr. Wilson, the interest having been paid on this loan on a regular *169 basis.In late 1969 Mr. Dalbey organized a company called Architectural Specialties, Inc. (ASI) to enter the business of manufacturing modular homes. In order to enable Tom Dalbey to enter this business, Mr. Wilson invested approximately $20,000 in the stock of ASI and gave the $200,000 he had received on the repayment of the T. H. Green note to ASI for a convertible debenture. In the late 1960's Tom Dalbey became involved with a new planned community near Rochester called Gananda. This was a project to be completed over a period of 20 years for the housing of approximately 85,000 persons. It had applied to the Department of Housing and Urban Development (HUD) for assistance. In 1971 Mr. Wilson agreed to loan $75,000 to the corporation developing Gananda on the condition that the other participants, including Tom Dalbey, also advance funds to the project. In 1963 Mr. Wilson discussed with his son Richard whether he would be interested in purchasing a business called Comac Business Supply Corporation (Comac) which manufactured and sold concrete blocks and masonry material. When Richard decided to become involved in the business with his uncle, Gerald Curran, Mr. Wilson assisted *170 the business financially by buying all of the assets of Comac and leasing them to the company operated by Richard Wilson and Mr. Curran. Mr. Wilson discussed with his son Richard the problems of the business and attempted to assist him in solving these problems. However, the company was not financially successful. On one occasion, after his son-in-law Tom Dalbey inadvertently missed an interest payment on one of the loans Mr. Wilson had made to him, Mr. Wilson had a system established whereby his children would be reminded in advance when the loans he had made to them were due. In February 1969 Mr. Wilson asked his oldest daughter, Joan Wilson Dalbey, to serve on the board of managers of the Joseph C. and Marie C. Wilson Foundation, a charitable orgnization. It had been Mr. Wilson's intent that each of his children serve on a rotating basis on the board of managers of this organization in order to give them experience in evaluating the work of various charitable organizations. During 1966 Mr. Wilson consulted his lawyer in Rochester, New York with respect to additional trusts for his children and a revision of his will. On November 28, 1966, this lawyer wrote to Mr. Wilson *171 regarding a will which had been prepared for him and enclosed a copy of a proposed trust for the benefit of Mr. Wilson's children. The proposed trust provided for the income of the trust established for each child to be paid to or for the benefit of that child, except that income could be accumulated for a child under the age of 23. The proposed trust further provided in the case of each child that one-half of the corpus would be paid to that child at age 30 and that the trust would terminate and the remainder would be paid to the child at age 40. On December 2, 1966, Mr. Wilson executed the will which had been prepared for him by the Rochester lawyer, but did not execute the trust. The will executed by Mr. Wilson on December 2 provided for Mr. Wilson's tangible personal property to go to Mrs. Wilson if she survived him and, if not, principally to his children.He also left to his wife the family home in South Bristol and the real estate at Delray Beach if she survived him. He made various provisions for this property to go to his children in case Mrs. Wilson did not survive him. In Article Eighth of this will Mr. Wilson provided for the establishment of a marital trust, in *172 the event his wife survived him, "equal to the maximum marital deduction allowable in determining the Federal estate tax payable by reason of my death * * *." The will stated in regard to this trust that: It is my intent and purpose that this Trust shall qualify for the marital deduction. Therefore, my executors shall not exercise any power or discretion conferred upon them by this Will or by law in such manner as to disqualify said trust, in whole or in part, for the marital deduction, and I direct that all provisions of this Will, or of any Codicil hereto, shall be subordinate to such intent and purpose. The will provided for all income of the marital trust to be paid to Mrs. Wilson and gave her the right to withdraw the principal as she desired for any purpose whatsoever upon her written request. It also gave Mrs. Wilson the right to appoint such property to her estate. It further provided that, to the extent Mrs. Wilson failed to exercise the power of appointment, the principal of the marital trust should become a part of the residue of his estate and be administered and distributed in accordance with the provisions of a trust established under Article Ninth of his will. *173 Article Ninth of Mr. Wilson's 1966 will provided that the residue of his estate be held by the Lincoln Bank in trust to be divided into the same number of shares as he had surviving children and children of a deceased child with children surviving. The will provided that the income from each child's share of this trust was to be paid to or for the benefit of that child during his or her lifetime. It provided that, upon the child attaining the age of 30, one-half of the principal was to be transferred to that child and the remainder was to continue in trust for the lifetime of such child. There was provision for discretionary accumulation of the income for any child under the age of 23 years. Also, the principal of a beneficiary's share could be invaded for his or her benefit when necessary, in the trustee's discretion, for his or her support, education or maintenance. Upon the death of a child the remaining trust principal was to be distributed in the manner that the child directed by will, except that the child had no power to appoint the principal to his or her estate or creditors. It further provided that, upon failure of a testamentary direction by a child, the trust principal *174 remaining was to pass to the child's living issue in equal shares. Mr. Wilson's 1966 will carried a direction that "all estate or inheritance taxes which may be assessed against the property passing under [the] Will or against any insurance proceeds and other property which may be subject to such taxes shall be paid from my residuary estate and that no part of such taxes shall be charged against any legatee or beneficiary under this will" and further provided, "and in particular I direct that no such taxes shall be charged against the legacy provided under Article EIGHTH hereof for my wife." On December 5, 1966, Mr. Wilson acknowledged receiving the draft of the trust. He wrote that, while he had no question about the trusts, he had not decided just what he was going to do that year, if anything, in connection with them and made the inquiry: "How small a token trust is it practical to set up?" He added that there would be a clear understanding that he would plan to make a major transfer some time before the middle of 1967.The letter also thanked the attorney for taking care of the will and stated that he was glad to have it completed. In a reply Mr. Wilson's attorney indicated *175 that nothing would be accomplished by establishing a token trust. In 1967, when explaining the additional gift to the University of Rochester to his oldest daughter, Mr. Wilson stated that the gift was part of his total financial plan and that in addition he would be forming trusts for his children at a later date.After his gift to the University of Rochester was made, Mr. Wilson told his son Richard that the Rochester University trust allowed Mrs. Wilson and him to do everything they had planned to do, that it provided them with sufficient income to maintain their residences and to travel, that they needed nothing other than that, and that it was his hope to establish trusts for each of his children. One of the employees at Xerox, who assisted Mr. Wilson with his personal financial affairs and income tax returns, made quarterly projections of income for Mr. Wilson after the early 1960's. In 1967, she made calculations for him of the gift tax that he would be required to pay on a hypothetical transfer of 48,000 shares of Xerox stock to a trust for his children. This employee informed Mr. Wilson that he would have to sell approximately 28,000 shares of Xerox stock to pay the *176 estimated gift tax. Because of Mr. Wilson's relationship with Xerox, his freedom to sell Xerox stock was restricted under Securities and Exchange Commission regulations. This employee was never asked by Mr. Wilson to make any calculations concerning the estate tax aspects of the trusts. In March 1968 the Lincoln Bank provided Mr. Wilson with a study of the distribution of his family property. Also, in the spring of 1968 Mr. Wilson contacted a Washington, D.C. law firm that specializes in tax law asking to confer with members of that firm on the tax aspects of trusts he was planning to set up for his children. The firm prepared to advise him on estate and income tax matters. In connection with the proposed conference Mr. Wilson supplied this law firm with a copy of the study prepared for him by the Lincoln Bank. In June 1968 Mr. Wilson wrote to a member of this firm stating that he had given direction for the sale of 30,000 shares of Xerox stock in preparation for the recommendations he expected them to make about his personal affairs and to carry out some plans he had had for a long time. Mr. Wilson stated that the major purpose of the sale was to provide for possible gift *177 taxes and some moderate diversification. On June 24, 1968, Mr. Wilson sold 11,000 shares of Xerox stock, and on July 9, 1968, he sold an additional 15,900 shares of Xerox stock. On August 14, 1968, Mr. Wilson met with two attorneys from the Washington firm. The basis of the discussion was a memorandum prepared by the attorneys comparing the gift and estate tax consequences that might flow from gifts by Mr. Wilson to his children. A schedule attached to this memorandum, which was shown to Mr. Wilson during the meeting, showed a potential net estate tax saving in the estates of both Mr. and Mrs. Wilson of $7,651,868 if gifts of $12 million were made to Mr. Wilson's children. Mr. Wilson was generally familiar with the tax advantages of making gifts, and the attorneys further briefed him on this subject. However, after looking over this computation, Mr. Wilson pointed out to the attorneys that when he sold some of his Xerox stock he had incurred a capital gains tax and would not have the use of the funds derived from the sale which caused him to incur that tax when these funds were used to pay gift tax. Under date of September 17, 1968, a more polished draft of the memorandum *178 used in the August meeting was prepared by the Washington attorneys for Mr. Wilson. It contained three sections entitled: I. Substantial Inter Vivos Gifts from Mr. Wilson in Trust for the Benefit of His Issue. II.Charitable Bequest of Residue for Term of Years. III. Will Revisions. In the portion of the memorandum relating to inter vivos gifts, it was pointed out that Mr. Wilson had an estimated gross estate of approximately $35 million, that Mrs. Wilson had a gross estate in excess of $3 million and that even with the full use of the marital deduction the estimated Federal estate and New York death taxes on the two estates would be approximately $26 million. It was further pointed out that "clearly" the most effective means of decreasing taxes and increasing the shares for the family was for Mr. Wilson to make substantial inter vivos gifts to his children. After detailed figures showing the total tax effect of gifts of $12 million by Mr. Wilson to his children as compared to leaving that amount in his estate, the memorandum pointed out that it was clear that there would be a substantial tax savings by a major gift program. The memorandum further pointed out that considering *179 only the estate plans of Mr. and Mrs. Wilson, it was immaterial if the gifts were outright to the children or grandchildren or in trust, but that -- by placing the gifts in trust with only an income interest and a limited power of appointment in the children, estate taxes can be avoided under present law at the death of the children, thereby substantially increasing the assets retained within the family for grandchildren. The memorandum also recommended that additional charitable bequests be made to further reduce estate taxes. In a letter dated September 24, 1968, Mr. Wilson stated that the inter vivos gifts were to have priority in the considerations of the Washington attorneys, but that he wanted to think about the timing for tax considerations. Also, on September 24, 1968, Mr. Wilson wrote to his attorney in Rochester enclosing a copy of the memorandum. In this letter Mr. Wilson stated in part as follows: I am enclosing a letter * * * relating to my own estate planning. * * * We did have a conversation about some of these principles in a preliminary way thirty days or so ago.I look upon all his suggestions favorably but, obviously, the No. 1 issue has to do with the inter *180 vivos gifts. * * * I am anxious to have a decision made shortly after I return from Europe, October 18. * * * In his letter to an official of the Lincoln Bank, also dated September 24, 1968, enclosing a copy of the memorandum from the Washington attorneys, Mr. Wilson requested "calculations about various levels for inter vivos gifts." On October 11, 1968, Mr. Wilson's Rochester attorney wrote to the Washington attorneys enclosing a copy of an instrument establishing lifetime trusts for Mr. Wilson's children and their issue. The letter stated: It seems to me that these trusts serve the primary purpose of removing assets from Mr. Wilson's estate. They do not make available to his children principal assets but, by power of appointment, his children can make available principal assets to grandchildren. The proposed trust instrument was forwarded to Mr. Wilson on October 21, 1968. While Mr. Wilson had discussed with his Rochester attorney the terms of the proposed trust agreement, at no time, either during 1968 or before, did he discuss with this attorney his reasons for creating these trusts. On October 22, 1968, Mr. Wilson acknowledged receipt of the proposed trust and *181 stated in part: I think the heat is off the date a little bit anyway because it seems to be quite clear, because of the peculiar income tax problems I have in 1968/69, it might be wise to set up these trusts as of early January 1969. Let's hope I keep my health until that time. * * * On October 17, 1968, the Lincoln Bank prepared for Mr. Wilson estimates of the estate tax effects of gift programs of various levels. The document showed a $7,651,868 saving on a gift of $12 million, a $6,405,718 saving on a gift of $10 million, a $5,180,597 saving on a gift of $8 million, a $3,698,642 saving on a gift of $6 million, and a $2,653,258 saving on a gift of $4 million. On December 17, 1968, Mr. Wilson's Rochester attorney sent Mr. Wilson the draft of a codicil to his December 2, 1966, will, the first such codicil, which was intended to prevent the funds of a trust of which Mr. Wilson was a beneficiary from passing to Mr. Wilson's children. This codicil was executed on December 23, 1968. On January 21, 1969, Mr. Wilson's Rochester attorney forwarded to Mr. Wilson a redraft of the proposed trust for Mr. Wilson's children, and Mr. Wilson, on January 30, 1969, acknowledged receipt *182 of the letter and the copy of the trust. On February 7, 1969, Mr. Wilson wrote his Rochester attorney that he approved certain changes in the wording of the trusts. Mr. Wilson wrote to his Washington attorneys on February 17, 1969, referring to their note to him of February 11, 1969. He stated he had been reading about proposed modifications in the tax law with great interest and wondered what, if any, actions he ought to take in light of this talk. He stated further that he was going ahead with the creation of the trusts regardless. On March 6, 1969, Mr. Wilson created six separate irrevocable trusts, one for the benefit of each of his six children and their issue. The sole trustee of these trusts is the Lincoln Bank. The initial principal of each trust was 7,500 shares of common stock of Xerox which had a value as of March 6, 1969, of $1,949,062.50. The trustee was expressly permitted to retain the Xerox stock and not to diversify the trust corpus. The trust provided that, until each child reached the age of 21, the trustee in its sole discretion should pay the net income of the trust to the child or apply the same to his use and benefit or accumulate part or all of *183 the income, provided that any accumulated income was to be paid to the child at the age of 21. After the child had reached the age of 21 the trustee was to pay the net income therefrom to such child or, as the trustee might determine in its sole discretion, apply the same to the child's use and benefit during such child's lifetime -- provided, however, that the Trustee is authorized to accumulate income when in its sole discretion to do so will be in the best interests of the child and to pay out the same from time to time to such child but in any event such undistributed accumulated income shall be added to principal annually. The trust further provided for the invasion by the trustee, in its sole discretion, of the principal of the trust for the support, education and maintenance of any such child or for his or her spouse and dependent children after taking into account the income of such child from other sources and his or her principal assets which could be readily reduced to cash without financial sacrifice. The trustee was directed to exercise this power generously in favor of the beneficiary. The trust provided that upon the death of a child the trustee was to pay over *184 the remaining principal and accumulated income in such manner as such child might appoint. However, this power of appointment could not be exercised in favor of the child's estate, creditors or creditors of his estate. The trust further provided that, to the extent a child failed to exercise his or her power of appointment, the amount of trust principal then remaining and any accumulated income was to be divided into shares for each then surviving issue of that child and the trustee was to hold each such share in a separate trust for the benefit of each such issue. The provisions of these secondary trusts were substantially the same as those of the initial trusts established by the instrument. Finally, the trust made the Joseph C. and Marie C. Wilson Foundation and the University of Rochester the ultimate contingent remaindermen. The trustee was further authorized in its sole discretion to pay from time to time during the term of the trust part or all of the income to, or to apply the income for the benefit of, the spouse of the current income beneficiary, the issue of the grantor including that of the income beneficiary, whether or not such issue's parents were living, or the *185 spouse of any such issue. The trust instrument provided that after the age of 30 years any designated current income beneficiary would have the right in any calendar year to withdraw from the principal of his or her trust an amount not in excess of the greater of $5,000 or 5 percent of the market value of the principal of the trust. The right of withdrawal was noncumulative. There was also a provision that, if legally permissible, an income beneficiary, after reaching the age of 30 years, could assign or appoint by written instrument up to 50 percent of his or her income interest to his or her spouse, to the issue of the grantor, to the spouse of any such issue, in trust or otherwise, or to any organization to which contributions are deductible under Federal income tax laws. And it was provided that any powers of invasion of principal or reallocation of income held by the trustee or beneficiaries would not be applicable to the principal underlying any income interest appointed to another person. About Christmas of 1968, Mr. Wilson told his daughter Katherine that he was nearing the end of an overall plan and that, since his children would some day inherit his property, he *186 saw no reason why they should wait for it until he died. He told her that he wanted his children to be independent financially and to have resources available so that they could do such things as travel and enjoy recreation while they were young and, when the need arose, rear and educate their families.
Mr. Wilson explained to his daughter Joan that the children were to receive only the income from the trust with the principal going to their children. He further explained that the 5 percent withdrawal plan "should be used for catastrophic purposes." Any withdrawal that Joan Wilson Dalbey has made from the principal of her trust has been used for purposes of reinvestment. Mr. Wilson told the Chancellor of the University of Rochester that he did not want his children to go along to mid-life and all of a sudden have a great change in their economic status. On March 7, 1969, Mr. Wilson wrote a letter to each of his children, stating: On the Sixth of March, I executed the trust about which I have been talking to you all for so long and by now 7,500 shares each will have gone into these trusts for the benefit of each of you. Mother and I, of course, are extremely happy to complete *187 this long and difficult plan because it really provides for you and your children so far as we can see for the rest of your and their lives. This has been our long-term, most important goal. You will all have very substantial resources for such young people. I know you will use them with a great sense of responsibility. A copy of the trust is enclosed. It ought to be put with your most important papers.
You should talk to Mr. Vanas at Lincoln Rochester about your over-all situation. You also should have a lawyer and if you want suggestions from us we think [Mr. Wilson's Rochester attorney] is more familiar than anyone else with the situation. You also should have wills drawn if you haven't done so and any that you drew in the past ought to be reconsidered in the light of the new situations in which you find yourselves now because of mother's death last summer plus the establishment of these trusts now. Later in March 1969, Mr. Wilson consulted his Rochester attorney seeking a "simple" chart showing the approximate principal amount which the children might receive under the various Wilson wills and trusts. The attorney stated that he had proceeded to a point, but *188 he could not approximate the amount the children might receive under the recently established trusts and Mr. Wilson's present will. On March 17, 1969, Mr. Wilson replied to the attorney, stating in part: I would like to have you work out a rough picture of the children's prospects under my will. The people at Lincoln Rochester, of course, know about the recent trust action and I think it is a good time to take a new look at the picture. By letter dated April 4, 1969, the figures Mr. Wilson had been asking for were furnished to him, and on April 14, 1969, Mr. Wilson asked for comments from his Rochester attorney and an official of the Lincoln Bank as to the distribution of his estate and also asked that they consult his Washington lawyers if desirable.
Under date of April 21, 1969, Mr. Wilson's Rochester attorney sent to Mr. Wilson a summary of the estimated proposed principal distribution to his children and grandchildren at various ages which showed the following: I. Children Age 25
Age 30
Age 35
Age 45
$18,000
$ 18,000
$ 36,000
$1,117,000
166,000
268,000
129,260
$18,000
$313,260
$304,000
$1,117,000
304,000
313,260
Total principal distributions
18,000
Total per child
$1,752,260
*189 II. Collective Issue of Each Child Age 21
Age 25
Age 30
Age 35
Age 40
$840,000
$167,000
$167,000
$ 83,000
54,000
$1,950,000
83,000
64,630
64,630
$894,000
$1,950,000
$314,630
$167,000
$ 147,630
167,000
314,630
1,950,000
Total principal distributions for the
894,000
Total collective issue of each child
$3,473,260 These estimated distributions were exclusive of the invasion rights of $5,000 or 5 percent of principal under the 1969 trust, but did include distributions at age 30 estimated under Mr. Wilson's 1966 will which was then in effect. On or about April 7, 1970, Mr. Wilson filed a Federal gift tax return reporting the gifts made in the trusts executed on March 6, 1969. His wife consented to split gifts in accordance with section 2513 and also filed a gift tax return on or about April 7, 1970. These returns reported a gift tax liability with respect to the March 6, 1969, trust gifts of $4,727,403, and this amount of gift tax was timely paid. These gift tax returns were accepted as filed by the Internal Revenue Service. Mr. Wilson also filed Federal gift tax returns for each of the *190 years 1961 through 1968 and for the year 1970. On each of these returns Mrs. Wilson consented to have the gifts she and her spouse made to third parties during the calendar years considered as having been made one-half by each of them. On August 20, 1969, Mr. Wilson's Rochester attorney wrote him a letter outlining the possible loss of a charitable deduction for the remainder interest left under the Rochester University trust, executed August 4, 1965, if legislation which had already been passed by the House of Representatives became law. Three options were suggested to Mr. Wilson: (1) Revoke Mrs. Wilson's right to life income; (2) Amend the trust to either an annuity trust or a unitrust; or (3) Amend his will to provide that all estate taxes resulting from inclusion of the trust in his estate be paid from and apportioned to the trust, rather than from the residuary estate as the will then provided. This letter concluded as follows: [As] an interim precaution it would be well to prepare a Codicil to your Will which would have the effect of burdening the trust with any tax which might be generated by its inclusion in your estate. * * * By letter dated August 27, 1969, Mr. *191 Wilson's Rochester attorney sent him a proposed second codicil to his 1966 will. It changed the computation of the marital trust created in the will to exclude from the gross estate the assets of the Rochester University trust and charged against the University trust any increase in estate taxes that might result from a disallowance of a charitable deduction to the estate. In this letter it was pointed out that this change would reduce the amount of the marital trust but would also reduce the total estate taxes paid by his estate and Mrs. Wilson's estate, even though there would be little or no tax on his estate, if he died first. This letter noted that -- use of the so-called formula method of measuring the marital deduction trust is by far the most flexible and suitable to your situation but even so the value of non-testamentary assets, included in the taxable estate but not actually part of the estate, must be watched for unanticipated results as indicated above. [Emphasis supplied.] On September 2, 1969, Mr. Wilson executed the second codicil to his 1966 will which provided as follows: I hereby direct that the following be added to my aforesaid Will as Article TWENTY-THIRD: *192 TWENTY-THIRD: Pursuant to the power vested in me under Article VI of a certain Agreement of Trust dated the 4th day of August, 1965 between me as Grantor, and the United States Trust Company of New York as Trustee, I do hereby revoke in whole the life estate established under Article II thereof for my wife, the remainder interest of THE UNIVERSITY OF ROCHESTER thereby vesting in possession on my death. I hereby amend Article TWENTY-SECOND of my aforesaid Will so that it shall read in its entirety as follows: TWENTY-SECOND: I direct that all estate or inheritance taxes which may be assessed against the property passing under this Will or against any insurance proceeds and other property which may be subject to such taxes shall be paid from my residuary estate and that no part of such taxes shall be charged against any legatee or beneficiary under this Will or against any transferee or beneficiary of any such other property, and in particular I direct that no such taxes shall be charged against the trust legacy provided under Article EIGHTH hereof for my wife, provided, however, that if the assets of a certain Agreement of Trust dated the 4th of August, 1965, between me *193 as Grantor and United States Trust Company of New York as Trustee, shall be included in my gross estate for estate or inheritance tax purposes but a charitable deduction shall be disallowed for the remainder interest vested in THE UNIVERSITY OF ROCHESTER thereunder, then and in that event I direct that there shall be apportioned against and paid from the assets of said trust so much of the estate or inheritance taxes assessed against my estate as result from the disallowance of the aforesaid deduction for the remainder to THE UNIVERSITY OF ROCHESTER. I direct that the following be added to my said Will as Article TWENTY-FOURTH: TWENTY-FOURTH: I direct that the legacies set out in Articles SECOND, THIRD and FOURTH of my aforesaid Will [a pecuniary legacy to the University of Rochester, a bequest of tangible personal property, and a devise of certain real estate] shall be preferred over the legacy provided under Article EIGHTH for the benefit of my wife [the marital trust]; and accordingly such legacies shall be paid in full (free of all inheritance or estate taxes) before any transfer or distribution of assets shall be made to my Trustee for the benefit of my wife under *194 said Article EIGHTH. On October 3, 1969, Mr. Wilson received a copy of a letter his Rochester attorney wrote to his Washington attorneys that discussed the options which might be taken if the proposed changes to the Federal estate tax law became effective. That letter discussed the reduction in the amount of the University trust, in the event estate taxes imposed by its inclusion in the estate were apportioned against the trust, as well as the increase in estate tax that would result from that tax being paid from the marital trust. This latter effect was determined by calculations referred to as the "so-called Greeley formula." Under date of October 16, 1969, an official of the Lincoln Bank wrote to Mr. Wilson's Rochester attorney enclosing copies of certain tax calculations which he had had prepared at Mr. Wilson's request. This letter stated in part: These are the calculations Joe Wilson desires to determine the tax impact on his estate if Mrs. Wilson remains as a secondary life beneficiary of the charitable trust and the charitable deduction at the time of his death is allowed but reduced by the value of her life interest. Calculation 1 - Current Situation - Shows the *195 impact but with the assumption that the taxes would be paid first from true residual assets and secondly from the marital trust. You will note that this eliminates the residuary, eliminates the marital trust and requires payment of $6,500,000 from the charitable trust. Calculation C - Uses the same facts as Calculation 1 but directs the tax payment first against the residue and then against the charitable trust. This protects the marital trust but reduces the charitable trust by $11,100,000. Calculation 2 - Shows the obvious results obtained if Mrs. Wilson is removed as a secondary life beneficiary. We have not furnished Joe Wilson with copies of these calculations. We have retained the originals so that they can be sent to him if they are correct. We would appreciate the opportunity of going over these calculations with you. Following one of the calculations was a note stating: NOTES
At this point a serious problem begins to emerge. A series of complicated computations must now be made because the only source of funds for the estate taxes is the amount available for the marital deduction. Reducing the marital deduction has the effect of increasing the taxable *196 estate.It then becomes apparent that a deficiency will begin to result. We must, therefore, look to the charitable trust for tax money since the existing testamentary estate is eliminated. A series of calculations resulting in an ultimate apportionment of $6,500,000 from the charitable trust will reduce the deficiency to $52,925. This also reduces Mrs. Wilson's life estate in the trust from $9,282,020 to $6,539,605. (The attached chart demonstrates this result.) On October 28, 1969, Mr. Wilson's Rochester attorney sent the calculations discussed in the letter to him from the official of the Lincoln Bank to Mr. Wilson together with additional computations he had prepared. This letter stated in part as follows: The taxes generated by Mrs. Wilson's life use are about $5,831,000 as set forth in my letter of October 3 (as corrected). There is something seemingly unsound in requiring $11,000,000 to pay a tax of $5,831,000 but such are the mathematics of the case. In this letter the attorney suggested that Mr. Wilson keep the following in mind with respect to the changes to be made in his estate plan: 1. The future size of the U. of R. trust is beyond control and so long as *197 Mrs. Wilson's survivorship trust is intact, any increase in value of the U. of R. trust will not increase the amount of her marital trust but will increase estate taxes which in turn will be charged against the University trust. This assumed increase will not harm your estate or affect Mrs. Wilson's marital trust so long as estate taxes are chargeable against the U. of R. trust. Should, for any reason, the attempted shift of taxes to this trust be unsuccessful, then the increase in the trust would place a proportionately larger tax against your estate and ultimately your family. As previously mentioned, our research definitely indicates that under the statute and pertinent cases (although none are on all four's with our situation), the tax impact can be charged against the U. of R. trust. I am not really concerned about the ability to shift the burden of this tax but even if there is a remote possibility that this could not be accomplished, I think it is a consideration which we should put in the hopper of our thinking. This is no doubt an abundance of caution but mindful of the amounts involved and the serious consequences in failure to shift the tax burden, I think this possibility, *198 remote as it may be, should not be completely ignored.
2. If Mrs. Wilson's life interest in the U. of R. trust is revoked, this would result in the value of the trust, whatever it might be, being included and then excluded in toto from your estate. Under your present Will, Mrs. Wilson's marital trust would be about $13,000,000 with no residuary estate and no estate taxes payable at your death. On Mrs. Wilson's later death, however, assuming her own assets to be about $4,000,000, her taxable estate would be $17,000,000, resulting in Federal and New York estate taxes of about $12,151,000. Before the end of 1969 one suggestion as a solution to the problem was for Mr. Wilson to revoke Mrs. Wilson's life estate in the Rochester University trust in exchange for an arrangement whereby the University would pay his designee an annuity of a specified number of installments. During negotiations between Mr. Wilson's Rochester suggested that if an agreement could be worked out attorney and an attorney for the University, it was Mr. Wilson would alter his will freeing the University trust of any estate tax burden. Mr. Wilson's attorney also pointed out that the present codicil "with its *199 revocation of Mrs. Wilson's life estate and payment of estate taxes from * * * [the] residuary estate, was definitely a temporary situation and could not be permitted to remain." By May 13, 1970, no agreement had been entered into between Mr. Wilson and the University of Rochester, and on that date Mr. Wilson's Washington attorneys suggested a change in Mr. Wilson's will which would preserve Mrs. Wilson's interest and allocate the resulting estate tax to the Rochester University trust as an intermediate measure. Seven days later Mr. Wilson's Rochester attorney sent to him a proposed third codicil to his will embodying this change. On September 4, 1970, no definite plan had been worked out, but a plan of payment to Mrs. Wilson from the University of $354,521 for 30 years was under consideration. In a letter of September 4, 1970, Mr. Wilson's Rochester attorney stated to him: In the estate tax return, there would be included as an asset the sum of about $6,440,000.00 ( $6) as the commuted value at your death of the 30 annual payments of $354,521.00 each. A similar amount would be included as part of the marital deduction and will, therefore, wash. There would also be included *200 the value of the trust principal, $22,000,000.00 ( $22), as a charitable deduction. * * * The suggested position of the Service [that the charitable deduction is decreased by the value of the annuity] would mean that the charitable deduction of $22 would be reduced by the commuted value of the University's obligation to make the annual payments or by $6. The combined Federal and New York estate taxes would initially be about $3,280,000.00 but by operation of the Greeley Formula, the tax actually payable would amount to some $17,000,000.00, a startling result but seemingly correct. The Greeley Formula comes into play as there would be no residuary estate from which to pay the tax, it being therefore chargeable against assets qualifying for the marital deduction. Mr. Wilson's Rochester attorney also discussed an alternative whereby Mr. and Mrs. Wilson would attempt to secure life insurance, but it was recognized that the possibility existed that neither of them could meet the necessary health requirements for such insurance. Mr. Wilson was unable to secure such insurance at a "bearable" rate, and Mrs. Wilson's life expectancy was diagnosed by her doctor as nowhere near normal. *201 A ruling was requested from the Internal Revenue Service with regard to accelerating the corpus of the trust for the University and a favorable decision was rendered. As a result, a meeting was held on December 2, 1970, between Mr. Wilson and his Rochester and Washington attorneys to discuss the solution to the problem. One of the items agreed upon in this discussion was that Mr. Wilson would eliminate the possibility of any estate tax apportionment being made against the University trust. Mr. Wilson's Washington attorneys then had further discussions with the lawyer for Rochester University which centered on Mrs. Wilson's health and Mr. Wilson's willingness to agree to exonerate the University from any estate taxes which might be apportioned against the University trust. On February 10, 1971, Mr. Wilson and the University of Rochester entered into an agreement which provided in part as follows: WHEREAS, First Party and Second Party now desire to enter a binding agreement for due consideration under which First Party will revoke the aforesaid life estate of his wife in the income of the Trust pursuant to the aforesaid subparagraph (a) of Article VI (thereby causing the remainder *202 of the Trust to vest immediately in possession in Second Party on the death of First Party), and in addition First Party will make certain commitments to assure that the assets of the Trust will not be required upon the death of First Party to bear any death taxes or other liabilities of First Party or First Party's estate, all in consideration of Second Party's entering into agreement to make the payments hereinafter set forth, * * * * * *
NOW, THEREFORE, in consideration of the premises and of the agreements hereinafter contained: 1. First Party hereby covenants and agrees that upon the execution and delivery of this Agreement First Party will immediately and irrevocably revoke the aforesaid life estate established under Article II of the Agreement of Trust for the benefit of his wife, thereby vesting in possession the entire remainder interest in Second Party and terminating the Trust upon the death of First Party. * * * 2. Second Party hereby covenants and agrees in consideration of the aforesaid revocation of the life estate of First Party's wife and of the agreements of First Party hereinafter set forth, to pay therefor thirty equal annual installments of Three *203 Hundred Thirty-Five Thousand Eight Hundred Dollars ($335,800.00) each, commencing on the first day of the second month immediately following the death of First Party (such amounts include interest at four percent (4%) per annum compounded annually, and no additional interest shall be payable), as provided in paragraph 3 hereof, provided, however, that Second Party shall not be required to make any payments hereunder unless MARIE CURRAN WILSON shall survive First Party (and if she and First Party die under such circumstances that it cannot be readily and definitely ascertained which of them survived the other, it shall be presumed that she did not survive him), and further provided, that First Party may reduce the amount or percentage of the installments payable by Second Party and such reduction shall be permanent and irrevocable. 3. Second Party shall pay the aforesaid installments (a) to such person or persons as may be designated by First Party in an acknowledged written instrument filed with the Second Party which instrument may be amended, modified or revoked by First Party by a similar instrument filed with Second Party at any time prior to his death, or (b) insofar as *204 such payments are not so directed to be made by an instrument on file with Second Party at the time of First Party's death, to the legatee or legatees designated to receive such installments in the duly probated Will of First Party, and to the extent that he shall fail to make such designation, then to MARIE CURRAN WILSON and her estate. * * *
5. First Party hereby covenants and agrees to execute and maintain a Will in which he directs that no part of (a) any estate, inheritance or other death taxes (including any interest and penalties thereon) imposed by any jurisdiction whatsoever by reason of the death of First Party upon or with respect to any property included in his estate for the purpose of any such taxes, whether such property passes under or outside, or has passed outside, the provisions of his Will, or (b) any debts of or charges or claims against First Party or his estate of any type or description (including funeral or administration expenses of his estate) shall be allocable to or paid from, in whole or in part, the assets of the Trust. In furtherance of this covenant, First Party hereby covenants and agrees on behalf of himself and his distributees, legatees *205 and estate to indemnify Second Party against and hold Second Party harmless from any such death taxes, debts, charges or claims ever being allocated to or having to be paid from the assets of the Trust, and First Party further covenants and agrees that he will not hereafter make any gifts or other transfers or dispositions not made for full consideration in money's worth which would have the effect of rendering First Party, his distributees, legatees or estate unable to fulfill this obligation of indemnification. On the same day, February 10, 1971, Mr. Wilson revoked the life estate payable to his wife from the University of Rochester trust. On February 17, 1971, Mr. Wilson executed a third codicil to his will revoking the second codicil and replacing it with a codicil that referred to the agreement of February 10, 1971, between him and the University of Rochester and gave $180,000 of each of the installments provided for in that agreement to his wife, Marie Curran Wilson, directing that any of said payments remaining on her death be paid to the personal representative of her estate, and gave the balance of each installment, $155,800, to the University of Rochester. By the same *206 codicil he amended Article Twenty-Second of his will to provide that his estate taxes be first paid from his residuary estate and, if that were insufficient, from the marital trust, but specifically directed that no estate inheritance or other death taxes or debts, charges or claims of any kind against his estate were to be allocated to or paid from the assets of the University of Rochester trust. He further amended Article Twenty-Third of his will to provide that the legacies of the real property provided for in his will should be preferred over Article Eighth, which provided for the marital trust. On June 2, 1971, Mr. Wilson's Rochester attorney sent to Mr. Wilson a proposed new will and stated that based on present computations there would be no residuary estate if Mrs. Wilson survived him. Regarding the revision of the tax apportionment clause, the letter stated: Page 21, Article NINETEENTH
This is the provision against tax apportionment and against any charges whatsoever being assessed against the University of Rochester Trust in accordance with our agreement. It also stated: Page 22, Article TWENTIETH
In the very remote and hopefully theoretical situation *207 in which the full U. of R. charitable deduction would not be allowed in full (the devil we chased) and a tax generated on your death as the first to die, there would be no residuary estate from which taxes could be paid and taxes would be chargeable either against your personal property and the real estate or against the assets of the marital trust subject to operation of the Greeley formula. Neither choice is attractive but on balance it seemed better to keep intact the real estate and personal property if this remote situation did occur. On August 4, 1971, Mr. Wilson's Rochester attorney sent a copy of Mr. Wilson's proposed new will to Mr. Wilson's Washington attorneys. In the letter transmitting this copy, the following was stated regarding the article that was the subject of the preceding quotation: From a practical point of view, I think this article should be eliminated. This was included to cover the remote situation in which our tax planning for some reason misfired, resulting in a residuary estate insufficient to pay both taxes and administration expenses. The payment of such charges, because of the Greeley Formula, from the marital trust assets would be costly but *208 nevertheless it seemed advisable to do so and preserve the real property. This was an abundance of caution as normally personal property would be used first. This is the way I believe it should be short of the extreme situation in which the marital trust would be reduced to the point where Mrs. Wilson would be unable to afford the properties, and to try to shift the burden of these charges under such circumstances to the real estate is, I believe, unwarranted. On August 20, 1971, Mr. Wilson executed a fourth codicil to his December 2, 1966, will which appointed to his wife the annuity payments due from the University of Rochester in their entirety. By letter dated September 10, 1971, Mr. Wilson's Rochester attorney sent Mr. Wilson a revised proposed will. In the covering letter the following was stated: Article TWENTY-SECOND regarding preference among abated legacies has been included for the reason that we know there will not be sufficient assets to fill the computed amount of the marital trust with the result that there will not be assets sufficient to pay in full the legacy to the University and the marital trust as computed. Consequently, this section provides that *209 when this shortage occurs, the devises and bequests of real and tangible personal property as well as the bequest to the University will be made in full, any deficiency coming from the marital trust.
I am working on some Greeley figures to estimate the worst that could happen in accordance with the request in your letter to Stewart of September 8. On September 15, 1971, Mr. Wilson executed a new will which, insofar as here pertinent, provided as follows: FIRST: I give and bequeath to my wife, MARIE CURRAN WILSON, all my clothing, jewelry, personal effects, household goods, furniture, furnishings, equipment, automobiles, boats and all other similar articles of tangible personal property wheresoever situate. In the event that she shall not survive me, I give and bequeath said articles of personal property which are in and about our residence at 1550 Clover Street, Brighton, New York, to my children surviving in equal shares, my corporate executor to determine such division as equally as possible. * * * SECOND: I devise to my wife, if she survives me, the real property and improvements thereon situate in the Town of South Bristol, Ontario County, New York, and the real *210 property and improvements thereon known as 801 South Ocean Boulevard, Delray Beach, Florida; my interest in our residence at 1550 Clover Street, Brighton, New York, to pass to her as surviving tenant by the entirety. THIRD: A. In the event that my wife shall not survive me, I give to each child of mine the option to purchase from my estate our residence at 1550 Clover Street, Brighton, New York, and the aforesaid properties in the Town of South Bristol, New York, and at Delray Beach, Florida, or any of them, including the household goods, furniture, furnishings, equipment and other personal property located in or used in connection with the two last mentioned properties, at an appraised value which my corporate executor shall determine to be its then fair market value; and said properties, or any of them, shall be sold on such terms and conditions, with or without security, as my corporate executor shall, in its sole discretion, determine. * * *
FIFTH: Under paragraphs 2 and 3 of a certain Agreement dated the 10th day of February, 1971, entered into by me as First Party and The University of Rochester as the Second Party, it is provided that Second Party shall pay, *211 under circumstances therein specified, thirty (30) annual installments each in the sum of $335,800.00 to the legatee or legatees designated to receive such installments in my Last Will and Testament. Pursuant to said terms of the aforesaid Agreement, I hereby give and bequeath each of the aforesaid installments of $335,800.00 to my wife, MARIE CURRAN WILSON, and direct that any of said payments remaining unpaid on her death, shall be paid to the personal representative of her estate. SIXTH: I give and bequeath to THE UNIVERSITY OF ROCHESTER the sum of $1,130,000.00, provided, however, that the amount of this legacy shall be reduced by the aggregate of any gifts made subsequent to the date of this Will and during my lifetime by me or my wife to said University, the value of said gifts to be determined as of the date thereof. TRUST A
SEVENTH: In the event that my wife, MARIE CURRAN WILSON, shall survive me, I give, devise and bequeath to my trustee hereinafter named, intrust, an amount which, when added to the proceeds of any life insurance paid to my trustee and apportioned to this Trust A as provided in the next ensuing paragraph, shall be equal in value *212 to onehalf of my adjusted gross estate, less the value of all other property interests included in my gross estate for Federal estate tax purposes and which pass or have passed from me to or for the benefit of my said wife, either under any other provision of this Will or in any manner outside of this Will, in such manner as to qualify for the marital deduction. * * *
It is my intent and purpose that this Trust A shall qualify for the marital deduction. Therefore, neither my executors nor my trustee shall exercise any power or discretion conferred upon them by this Will or by law in such manner as to disqualify said trust, in whole or in part, for the marital deduction, and I direct that all provisions of this Will, or of any Codicil hereto, shall be subordinate to such intent and purpose. 1. My trustee shall pay the entire income to my wife, MARIE CURRAN WILSON, or apply the same to her use and benefit, in quarterannual or more frequent installments so long as she shall live. 2. I hereby grant to my wife the power to appoint the principal of this trust from time to time by acknowledged written instruments delivered to my trustee, effective on such delivery, subject *213 to the following terms, limitations and conditions: (a) Such appointment may be outright, in trust or otherwise, and shall be limited to religious, charitable, scientific, literary, educational and such other organizations as are described in Section 170(c) of the Internal Revenue Code as it may be amended from time to time, and to my issue and their respective spouses, and (b) the total of all property so appointed (valued at the effective date or dates of such appointment) under this subparagraph shall not exceed twenty-five percent (25%) of an amount determined by adding to the market value of this trust immediately prior to such appointment the value of all property previously appointed hereunder. (c) This power shall be exercised only by specific reference to this provision of my Will. 3. In addition to the power of appointment granted to my wife under subparagraph 2 above, she shall have the right to withdraw up to $100,000.00 annually from the trust principal for any purpose whatsoever, and in addition thereto, such amounts as may be required for the payment of gift taxes of my wife, and her written request for such amounts shall constitute the *214 authority for my trustee to make such payment or payments. Such right of withdrawal shall be noncumulative. 4.My trustee is authorized to pay to my wife, or apply to her own use and benefit, from time to time, so much of the trust principal as it shall deem necessary for her comfort, care and support in substantially the style and manner to which she was accustomed at the time of my death, after taking into account her income from all sources, and I direct that my trustee shall exercise this discretion liberally in favor of my wife, even to the full extent of the trust principal if my trustee shall deem it advisable. 5. Upon the death of my wife, the principal remaining in this trust shall be distributed by my trustee to or for the benefit of such one or more persons or corporations, in such manner and in such proportions, whether outright, in trust or otherwise, as my said wife may by her Last Will and Testament direct and appoint, including the right in my wife to appoint said property to her estate and to the creditors of her estate. Such power of appointment shall be exercisable by my wife exclusively and in all events but shall be exercisable only by specific reference *215 to this power.My trustee may rely upon an instrument admitted to probate in any jurisdiction as the Last Will of my wife, but if it has no written notice of the existence of such Will within a period of three months after her death, it may be presumed that she died intestate and my trustee shall be protected in acting in accordance with such presumption; but this protection to my trustee shall not limit or qualify said power of appointment or the right of any person to pursue the funds affected by the exercise thereof, irrespective of the place of probate or time of discovery of the Will. To the extent that my wife fails to exercise effectively the power of appointment herein conferred upon her, then upon her death, the trust principal, or any part thereof not effectively appointed, shall become a part of the residue of my estate, and shall be held, administered and distributed pursuant to the terms and provisions of Trust B of Article EIGHTH hereof. TRUST B
EIGHTH: I give, devise and bequeath all the rest, residue and remainder of my estate of every kind and nature and wheresoever situate, to my trustee hereinafter named, intrust, for the following uses and *216 purposes: A. 1. My trustee shall hold and administer my said residuary estate for the benefit of my wife, MARIE CURRAN WILSON, and my living issue as such group may be constituted from time to time whether the parents of such issue are living or deceased, (my wife and issue collectively being hereinafter referred to as "beneficiaries"). In quarterannual or other convenient installments, my trustee shall pay to, or apply to the use and benefit of, any or all of the foregoing beneficiaries so much of the income of the Trust in such amounts and proportions, as my trustee, in its sole and absolute discretion, shall deem advisable without regard to equality of distribution and even to the exclusion of any one or more of such beneficiaries. Any income not so disbursed shall be accumulated and added to trust principal at least annually. In exercising its discretion as to the amount of income to be paid to any of the beneficiaries, my trustee shall take into consideration the current and probable future financial requirements, income and assets of each beneficiary, and such other matters as it deems advisable. 2. My trustee is authorized in its sole and absolute discretion, at any *217 time and from time to time, to pay to my wife, or to apply to her use and benefit, such amounts of trust principal as it may deem necessary to provide adequately for her proper maintenance, support, welfare and comfort in substantially the style and manner to which she was accustomed at the time of my death, and it is my request but not my direction that my trustee, in exercising this discretion, shall consult with my wife and be guided by her suggestion as to the amount of principal needed for such purposes. In determining the amounts of principal to be so disbursed, my trustee shall take into consideration all income which my wife may have from all sources as well as her right to withdraw the principal and my trustee's power to use the principal of Trust A aforesaid for the benefit of my wife, it being my desire that the principal of Trust A shall be first used for the benefit of my wife as aforesaid before the principal of this Trust shall be used. B. Upon the death of my wife, the remaining principal of Trust B as it may be increased by the principal of Trust A as aforesaid or the unappointed principal of Trust A if no assets were available on my death for the establishment *218 of Trust B, or, if my wife shall not have survived me, then my residuary estate, as the case may be, shall be divided into shares, making one equal share for each then surviving child of mine and one equal share for each deceased child of mine with issue then surviving, said latter share to be divided into subshares perstirpes for the issue of such deceased child of mine; and I direct that the share of each child of mine and the subshare of the issue perstirpes of each such deceased child of mine shall be held intrust for the uses and purposes set forth in Articles NINTH, TENTH and ELEVENTH below. * * *
TWENTY-FIRST: I direct that all estate, inheritance or other death taxes which may be assessed against the property passing under this Will or against any insurance proceeds and other property which may be subject to such taxes shall be paid from my residuary estate, and to the extent that my residuary estate may be insufficient to pay in full the aforesaid taxes, I direct that said taxes shall be charged first against the legacy to THE UNIVERSITY OF ROCHESTER under Article SIXTH and to the extent its assets are insufficient, then against the trust *219 legacy for the benefit of my wife established under Article SEVENTH hereof, and to the extent its assets are insufficient, then against the other legacies provided for in my Will; but in particular, I direct that no part of (1) said taxes (including any interest and penalties thereon) imposed by any jurisdiction whatsoever by reason of my death upon or with respect to any property included in my estate for the purpose of any such taxes, whether such property passes under or outside, or has passed outside, the provisions of my Will, or (2) any debts of or charges or claims against my estate of any type or description (including funeral or administration expenses of my estate) shall be allocable to or paid from, in whole or in part, the assets of a certain trust dated the 4th day of August, 1965, between me as Grantor and United States Trust Company of New York as Trustee. TWENTY-SECOND: I direct that the legacies provided for in Articles FIRST, SECOND, SIXTH (except to the extent that the assets of the Article SIXTH legacy may be required for the payment of estate taxes) and FOURTEENTH of my aforesaid Will shall be preferred over the trust legacy provided under Article *220 SEVENTH for the benefit of my wife; and accordingly such devises and legacies shall be fully effective or paid before any transfer or distribution of assets shall be made to my trustee for the benefit of my wife under said Article SEVENTH. In accordance with the provisions contained in the trust agreement of March 6, 1969, made by Mr. Wilson, his children have made the following withdrawals: Year
Joan W. Dalbey
J. Richard Wilson
Katherine Kling
1971
$ 0
$110,000
$ 0
1972
119,000
125,070
0
1973
127,935
100,000
128,980
1974
69,222
55,000
65,038
1975
77,212
35,000
83,633 Between the time in 1969 when the trust was created and the date of Mr. Wilson's death, income distributions totaling approximately $400,000 had been made under the March 6, 1969, trust to all of Mr. Wilson's children. After Mr. Wilson created the trusts he received regular statements from the trustee with respect to the trusts and diversification of the trusts. The following schedule shows the percentage of the fair market value of each trust invested in Xerox common stock on November 22, 1971: Percentage of Fair Market Value of Trust for:
Trust Invested in Xerox Stock
Joan Dalbey
41% ($848,000 out of $2,046,036.69)
Richard Wilson
43% ($832,100 out of $1,944,979.32)
Katherine Kling
41% ($848,000 out of $2,046,036.68)
Judith Wilson
41% ($848,000 out of $2,046,036.69)
Deirdre Garton
41% ($848,000 out of $2,055,027.68)
Janet Wilson
41% ($848,000 out of $2,055,027.68)
*221 As of January 31, 1975, the following schedule shows similar percentages: Percentage of Fair Market Value of Trust for:
Trust Invested in Xerox Stock
Joan Dalbey
24% ($333,817 out of $1,396,090)
Richard Wilson
28% ($366,600 out of $1,304,970)
Katherine Kling
24% ($359,550 out of $1,492,821)
Judith Martin(*)
27% ($444,150 out of $1,623,432)
Deirdre Garton
28% ($444,150 out of $1,582,009)
Janet Wilson
27% ($444,150 out of $1,632,330)
Between 1965 and the date of his death, Mr. Wilson received the following distributions from the University of Rochester trust: 1965
$ 5,250.00
1966
57,942.67
1967
229,474.65
1968
506,295.59
1969
485,108.27
1970
733,644.91
1971
807,702.81
On May 28, 1976, the date of the most recent estate review conducted by the executors of Mr. Wilson's estate prior to the trial of this case, the fair market value of all current probate assets in the estate of Joseph C. Wilson, with the exception of real property and tangible personal property, was $11,924,955. The probate assets listed on this schedule did not include the value of the annuity *222 to Mrs. Wilson from the University of Rochester. On the date of his death, Mr. Wilson owned $617,599 of nonjointly-held real property. On the date of Mr. Wilson's death, the annuity payments to be made within 30 years to Mrs. Wilson under the University of Rochester trust had a commuted value of $4,897,430.33. On the date of Mr. Wilson's death, he owned jewelry of a value of $120, household furnishings of a value of $39,123, automobiles of a value of $7,600, art work of a value of $503,000, and a business machine of a value of $82,189.24. On the estate tax return a total gross estate of $43,505,428.81 was reported, with a taxable estate of "None" being reported. The commuted value of the annuity payment by the University of Rochester to Mrs. Wilson was reported on the return as miscellaneous property, and this same amount was later shown as an interest passing to a surviving spouse as part of the marital deduction. On the return, on Schedule N, a charitable bequest of $22,173,587.66 was claimed with respect to the University of Rochester trust. Respondent in his notice of deficiency made the following increases and decreases to the gross estate as reported: a.) Stocks and Bonds
$ 4,715.92
b.) Transfer with retained interest
[4,897,430.33)
c.) Transfers in contemplation of
death
$12,193,144.74
d.) Transfers in contemplation of
death
$ 200,000.00
e.) Marital Deduction
$19,477,930.15
f.) Charitable Deduction
$ 1,130,000.00
g.) Charitable Deduction
$ 4,897,430.33
*223 These adjustments resulted in a taxable estate as revised of $32,945,790.81 and a gross estate tax of $23,756,458.92, with credit for gift tax of $4,727,403, resulting in an estate tax liability of $19,029,055.92. The asserted transfer in contemplation of death of $12,193,144.74 was explained as follows: c.) It is determined that the transfer of stock to the trust created by the decedent on or about March 6, 1969, and listed in Schedule G, Item 13 of the estate tax return, was transferred by him in contemplation of death. Accordingly, the fair market value, as of the date of decedent's death, of the 45,000 shares of Xerox Corp. common stock, is includible in the gross estate. The additions of $19,477,930.15 and $1,130,000 because of disallowance of marital and charitable deductions were explained as follows: e.) It is determined that the only property qualifying for the marital deduction which is not consumed by the payment of estate taxes is limited to the jointly owned property listed in Schedule M, Item 1 in the amount of $129,814.72. All other marital deduction items will be consumed by the payment of estate death taxes in accordance with the will of decedent. * * *224 * f.) It is determined that the bequest to the University of Rochester under Article Sixth of decedent's will, will be consumed by taxes with nothing available for the University. Accordingly, it does not qualify for the charitable deduction.[4] OPINION Section 2035 provides that the gross estate of a decedent shall include the value of all property which the decedent transferred, except for full and adequate consideration, in contemplation of death. This statute further provides that where the transfer is made within 3 years of the date of the decedent's death, it is presumed to have been made in contemplation of death unless shown to the contrary. [5]
*225 The regulation, sec. 20.2035-1(c), Estate Tax Regs., defining the phrase "in contemplation of death" states that the phrase-- does not have reference to that general expectation of death such as all persons entertain. On the other hand, its meaning is not restricted to an apprehension that death is imminent or near. A transfer "in contemplation of death" is a disposition of property prompted by the thought of death (although it need not be solely so prompted). A transfer is prompted by the thought of death if (1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death. The bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized in order to determine whether or not such thought prompted the disposition. This definition is substantially the same as that given by the Supreme Court in United States v. Wells,283 U.S. 102 (1931), and again confirmed as the proper definition of the term by the Supreme Court in Allen v. Trust Co. of Georgia,326 U.S. 630 (1946). The issue *226 by its nature is essentially a question of fact. The factual determination is inherently the subjective one of the intent of the deceased, but it must necessarily be made by a consideration of all the objective facts placed in evidence from which intention may be gleaned. As stated in United States v. Wells,supra, "[there] is no escape from the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condition; and thus give effect to the manifest purpose of the statute." This purpose was stated by the Supreme Court to be "to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax." In arriving at the factual conclusion consideration must be given to such factors as the nature of the gift itself, particularly as compared to prior gifts, the relationship of the donee to the decedent, the size of the gift as compared with the total wealth of the decedent, the association with testamentary acts such as preparation of a will or consideration of a new will made at approximately the time of the gift, the general health of the decedent *227 at the time the gift was made, the motives for the gift which are or might be connected with life, and the prominence of such motives in influencing the making of the gift. See Estate of Johnson v. Commissioner,10 T.C. 680 (1948). Against the general background of these guidelines, we must consider in this case each fact that bears on the motive of Mr. Wilson in making the gifts in trust to his children in 1969. In our view, the record here establishes that although Mr. Wilson undoubtedly recognized that his life expectancy was probably less than that of the average person of his age, he did not at the time of making these gifts have any apprehension that his death was imminent. This conclusion is of course a subjective one since an individual may well have an apprehension that death is imminent and still opt to live a full and useful life. However, Mr. Wilson took a great length of time and gave detailed consideration to the establishment of the trusts. Since he was clearly aware of the estate tax benefit in establishing the trusts, we would conclude he would have proceeded much more rapidly had he had an apprehension of imminent death. In spite of the above *228 conclusion, however, it is our view that the dominant motive of Mr. Wilson in establishing these trusts was to make these gifts as a substitute for a testamentary disposition of the property with the resulting savings in estate tax. We reach this conclusion after considering all the facts established in this record. Some of the facts which have prompted us to reach this conclusion include: (1) the magnitude of the gifts made in the trusts created on March 6, 1969, as compared to the amounts of gifts made during previous years by Mr. Wilson to his children; (2) the fact that under Mr. Wilson's 1966 will there would be left no property to go into the trusts for his children provided for in that will after these gifts were made; [6] (3) except for limited invasion rights, the principal of the trusts never was to be distributed to his children and possibly would not be distributed to his grandchildren but would remain intact until distribution to his great grandchildren, a type of provision indicative of thoughts of savings in estate tax; (4) immediately upon establishment of the trusts, Mr. Wilson began the process of adding codicils to his then-existing will and the drafting of a new *229 will; (5) each of Mr. Wilson's children was the beneficiary of other trusts with total assets of approximately $2,500,000 per child at the time Mr. Wilson established the March 6, 1969, trusts, which trusts produced substantial income distributable to the children; and (6) Mr. Wilson was a trustee of some of the other trusts for his children and the record is not clear whether the children actually received the income from these trusts. The record shows that Mr. Wilson stated to a number of persons that he wanted to see his children enjoy substantial income while *230 he was living and could advise them as to its use. In fact petitioner's primary claim to an impelling life motive for the gifts made by Mr. Wilson to the trusts for his children are these statements and Mr. Wilson's show of interest and concern for his children. Certainly the record shows that Mr. Wilson had a strong interest in the welfare of his children and their families. It also shows that he was interested in the careers they chose and their business activities. We do not doubt that Mr. Wilson made the statements attributed to him or that he did in fact wish to advise his children with respect to the proper use of money. However, the fact that each of Mr. Wilson's children was the beneficiary of trusts with total corpus of approximately $2,500,000 and yearly income of approximately $33,000 at the time Mr. Wilson established the March 9, 1969, trusts indicates to us that additional income for his children was not as impelling a reason for his establishment of the trusts as was his desire to save estate tax. There is nothing in this record to indicate that the trusts already established for Mr. Wilson's children could not have produced several times the annual income they *231 did produce had the trustees, including for the largest trust Mr. Wilson, chosen to place the trust assets in securities with a moderately higher return of income. There are many other facts in this record which we have detailed in our findings that also lead to our conclusion that the dominant motive of Mr. Wilson in establishing the March 6, 1969, trusts was to make a distribution of a substantial part of his estate in the nature of a testamentary disposition. The record contains little that indicates to us strong motives connected with life in the establishment of the trusts. The record shows gifts and loans by Mr. Wilson to his children when they had need of money for specific purposes, but all the prior gifts made by Mr. Wilson to his children were quite modest in amount for a person in his economic circumstances. Many of Mr. Wilson's prior gifts to his children were Christmas gifts to the trusts he established for them in 1961. Weighing all the evidence in this voluminous record, we conclude that the gifts made by Mr. Wilson to the trusts created for his children on March 6, 1969, were gifts in contemplation of death within the meaning of section 2035. Having decided *232 the first issue in favor of respondent, we must determine whether the estate taxes resulting from the inclusion of the 1969 trusts in Mr. Wilson's gross estate are to be borne exclusively by certain funds in his probate estate described in Article Twenty-First of his will or whether those taxes may be apportioned to the assets of the 1969 trusts pursuant to N.Y. Est., Powers & Trusts Law § 2-1.8 (McKinney 1967). [7]
*233 The apportionment of Federal estate taxes against assets included in the gross estate is a matter of State law. Riggs v. Del Drago,317 U.S. 95 (1942). The applicable provision of New York law, N.Y. Est., Powers & Trusts Law § 2-1.8 (McKinney 1967), provides in pertinent part: Sec. 2-1.8 Apportionment of federal and state estate or other death taxes; fiduciary to collect taxes from property taxed and transferees thereof (a) Whenever it appears in any appropriate action or proceeding that a fiduciary has paid or may be required to pay an estate or other death tax, under the law of this state or of any other jurisdiction, with respect to any property required to be included in the gross tax estate of a decedent under the provisions of any such law (hereinafter called "the tax"), the amount of the tax, except in a case where a testator otherwise directs in his will, and except where by any instrument other than a will (hereinafter called a "non-testamentary instrument") direction is given for apportionment within the fund of taxes assessed upon the specific fund dealt with in such non-testamentary instrument, shall be equitably apportioned *234 among the persons interested in the gross tax estate, whether residents or non-residents of this state, to whom such property is disposed of or to whom any benefit therein accrues (hereinafter called "the persons benefited") in accordance with the rules of apportionment herein set forth, and the persons benefited shall contribute the amounts apportioned against them. * * *
(c) Unless otherwise provided in the will or non-testamentary instrument: (1) The tax shall be apportioned among the persons benefited in the proportion that the value of the property or interest received by each such person benefited bears to the total value of the property and interest received by all persons benefited, the values as finally determined in the respective tax proceedings being the values to be used as the basis for apportionment of the respective taxes. (2) Any exemption or deduction allowed under the law imposing the tax by reason of the relationship of any person to the decedent, the fact that the property consists of life insurance proceeds or the charitable purposes of the gift shall inure to the benefit of the person bearing such relationship or receiving such insurance proceeds *235 or charitable gift, as the case may be. (3) Any deduction for property previously taxed and any credit for gift taxes paid by the decedent shall inure to the benefit of all persons benefited and the tax to be apportioned shall be the tax after allowance of such deduction or credit. * * *
(d) Any direction as to apportionment or non-apportionment of the tax, whether contained in a will or a non-testamentary instrument, relates only to the property passing thereunder, unless such will or instrument provides otherwise.
The apportionment provisions of this statute apply to all estates "unless there is a clearly expressed intention to the contrary in the will." In re Pepper's Estate,307 N.Y. 242, 246, 120 N.E. 2d 807, 809 (1954). Unless there is a "clear and unambiguous direction" in the will against its application, the statutory apportionment scheme prevails. In re Pepper's Estate,supra.Furthermore, the requirement that the direction be "clear and unambiguous" is especially strong where exoneration of non-testamentary property is at issue. In re Leonard's Estate,9 App. Div. 2d 1, 189 N.Y.S. 2d 422 (3d Dept. 1959). *236 Indeed, the statute itself seems to contain such a bias in its provision that a direction against apportionment relates only to property passing under the will unless the will provides otherwise. N.Y. Est., Powers & Trusts Law § 2-1.8(d) (McKinney 1967). Respondent contends that Article Twenty-First of Mr. Wilson's will [8] provides the direction against apportionment of taxes that would be required by the New York statute to exonerate the 1969 trusts. However, while this provision standing alone could easily be interpreted as contended by respondent, we find that it is at best ambiguous when construed in light of the will as a whole and the circumstances surrounding its execution. See In re Fabbri's Will,2 N.Y.2d 236, 140 N.E.2d 269 (1957); In re Kaufman's Estate,170 Misc. 436, 10 N.Y.S.2d 616 (N.Y. County Surr. Ct. 1939). *237 The operative language upon which respondent relies is the term "other property" found in Article Twenty-First in the passage describing which taxes are to be allocated in accordance with the provisions of that article. This passage reads, "taxes which may be assessed against the property passing under this Will or against any insurance proceeds and other property which may be subject to such taxes" [emphasis added]. Respondent's contention is that the term "other property" when used in this passage clearly and unambiguously encompasses the trusts established by Mr. Wilson for his children on March 6, 1969. If so, the other funds described in the article would be applied to the payment of taxes in preference to the 1969 trusts. However, if this is not the case, then the New York apportionment statute, as interpreted by the courts, applies to apportion taxes against those trusts. While the term "other property" in the context of this passage could be interpreted logically to include the 1969 trusts, an examination of the will as a whole suggests another logical interpretation. Our examination of the will leads us to conclude that Mr. Wilson may well have intended by *238 "other property" property passing outside his will by reason of his death and not property that had passed before that time for other reasons.In Mr. Wilson's case, such property included jointly-held property and the annuity payable by the University of Rochester. Our conclusion that Mr. Wilson may have intended the term "other property" not to include property which had passed prior to his death is itself sufficient to lead us to find the will ambiguous in its instructions regarding apportionment of taxes against the 1969 trusts. Initially, we note that, in the only other passages in the will describing non-testamentary property included in Mr. Wilson's gross estate for tax purposes, the will draws a clear distinction between property passing at the time of Mr. Wilson's death and property that had passed before his death. In the apportionment clause itself, such language is used in exonerating the 1965 University of Rochester trust: "any property included in my estate for the purpose of any such taxes, whether such property passes under or outside, or has passed outside, the provisions of my Will." [Emphasis added]. Also, in establishing the marital trust, the following *239 terminology is used: "all other property interests included in my gross estate for Federal estate tax purposes and which pass or have passed from me * * * under any other provision of this Will or in any manner outside of this Will." [Emphasis added]. Also, the failure of the decisive passage to use the words "all" or "any" to describe "other property" is meaningful, at least in this will, because of their almost universal use in the will in other appropriate descriptive passages. Furthermore, we note that "other property" is used in conjunction with and following "insurance proceeds" and that this might indicate an association in Mr. Wilson's mind with property of like nature, i.e., property passing by reason of his death. Cf. In re Falvey's Will,15 App. Div. 2d 415, 224 N.Y.S.2d 899 (1962), affd. per curiam, 12 N.Y.2d 259, 186 N.E.2d 563, 234 N.Y.S.2d 713 (4th Dept. 1962). A major consideration in our decision, supported by the factors listed above, is a paragraph in Article Seventh of Mr. Wilson's will, relating to the marital trust. This paragraph reads: It is my intent and purpose that this Trust A shall qualify for the marital *240 deduction. Therefore, neither my executors nor my trustee shall exercise any power or discretion conferred upon them by this Will or by law in such manner as to disqualify said trust, in whole or in part, for the marital deduction, and I direct that all provisions of this Will, or of any Codicil hereto, shall be subordinate to such intent and purpose.[Emphasis added.] The direct effect of respondent's interpretation of the apportionment clause is the total elimination of the marital trust. All of the assets that would otherwise fund it would be consumed in payment of taxes. Respondent argues that there is nothing inconsistent in the expressed desire to qualify a trust for the marital deduction, on one hand, and a direction eliminating all funds for that trust, on the other. Even if respondent were technically correct, it is our view that Mr. Wilson did not intend to draw this fine distinction and had no reason to do so. In our view, by this provision Mr. Wilson intended to subordinate the other provisions of his will, including the apportionment clause, to his desire to establish a viable, funded trust for his wife. This intent is wholly inconsistent with respondent's interpretation *241 of Mr. Wilson's apportionment clause. Cf. In re Rodgers' Will,249 App. Div. 238, 291 N.Y.S. 815 (2d Dept. 1936); In re Lieberman's Will,147 N.Y.S.2d 815 (Westchester County Surr. Ct. 1955). The alternative interpretation of Mr. Wilson's apportionment clause suggested to us by the language of his will is reinforced when considered in light of the circumstances surrounding the execution of his will. Among the documents suppliedto Mr. Wilson when planning his estate were descriptions of the distribution of his estate under his will that made approximations of the assets in the marital trust at values from $13 million to $14.5 million. The inference from the record is that Mr. Wilson acted on these assumptions in executing his will. Furthermore, Mr. Wilson received frequent suggestions from his attorneys that, in order to save estate taxes on their combined estates, he should reduce the amount of funds going into the marital trust by diverting them into the family trust provided for under his wills. The record shows that, although he considered this advice, he consciously refused to follow it. On the whole, the record shows that Mr. Wilson went *242 to great pains to ensure that Mrs. Wilson would have sufficient funds to maintain her standard of living indefinitely. It also shows that he believed that not only the funds of the marital trust but other funds as well might be necessary for this purpose. These facts cannot be reconciled with the intent that respondent argues is evident from the apportionment clause. The only explanation of the apportionment clause provided to Mr. Wilson by any of his advisors, including the draftsmen of the will, was that the provision was in accordance with his agreement with the University of Rochester relating to the exoneration of the 1965 trust. Respondent makes the further argument that, because Mr. Wilson was aware of the dramatic increase in estate tax liability when otherwise deductible funds are used to pay estate taxes, he must have intended that result if he died leaving any taxable estate. Respondent also urges us to find that Mr. Wilson in fact contemplated that the marital deduction would be wiped out by the provisions of the apportionment clause.Neither contention finds support in the record. Any knowledge Mr. Wilson might have possessed concerning this increase in estate *243 taxes or inclusion of gift property in his gross estate was received in connection with property other than the 1969 trusts, and the problems with these properties, so far as Mr. Wilson knew, had been resolved. Even assuming the knowledge respondent imputes to Mr. Wilson, we would not reach respondent's conclusions based on our understanding of Mr. Wilson's intention obtained from the record. Finally, respondent argues that the change in apportionment clauses between the 1966 and 1971 wills evidences an intent to burden the marital trust with the taxes incurred because of the 1969 trusts. Under the 1966 will the marital trust was expressly exonerated from payment of taxes, but in the third codicil to that will, executed February 17, 1971, it was included in the series of funds subjected to payment of taxes. We find an equally plausible explanation for this change, however. Under the 1966 will, only the residuary was expressly burdened with taxes. By agreement with the University of Rochester on February 10, 1971, Mr. Wilson was required to exonerate the University's trust. The redrafting of the clause gave Mr. Wilson's attorneys an opportunity to refine the order of payment *244 of taxes by placing assets least appropriate for payment of taxes last on the list. Correspondence regarding the apportionment clause in the 1971 will, which was identical to that in the third codicil, affirms this intent. Forwarding a copy of this proposed will to Mr. Wilson on June 2, 1971, its draftsmen explained: In the very remote and hopefully theoretical situation in which the full U. of R. charitable deduction would not be allowed in full * * * and a tax generated on your death as the first to die, there would be no residuary estate from which taxes could be paid and taxes would be chargeable either against your personal property and the real estate or against the assets of the marital trust subject to operation of the Greeley formula. Neither choice is attractive but on balance it seemed better to keep intact the real estate and personal property if this remote situation did occur. In conclusion, we find that Mr. Wilson's direction in Article Twenty-First is susceptible to two at least equally plausible interpretations. The will is, at best, ambiguous regarding the apportionment of estate taxes. Therefore, we find that under New York state law the statutory scheme *245 of apportionment provided by N. Y. Est., Powers and Trusts Law § 2-1.8 (McKinney 1967) applies to apportion taxes to the 1969 trusts. See In re Pepper's Estate,supra.
Because of our conclusion on the second issue presented to the Court, we do not reach the issue whether the annuity payable by the University of Rochester was one of "the other legacies provided for in my Will" under Article Twenty-First.Because of the apportionment of taxes against the 1969 trusts, no taxes will be borne by these "legacies," regardless of what funds they include. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. In the petition an issue is raised with respect to whether certain debts owed to decedent at the date of his death were worthless. However, no evidence was introduced on this issue at the trial and we therefore assume that petitioner has abandoned the issue.↩
3. There is no explanation in the record of the inconsistency between the trust income reported by Mr. Wilson's children in 1969 and the schedule showing the income in 1969 from each of the A trusts as being $7,374.40. Under the provisions of the A trusts, distribution of income was required after a child reached 21. There is also no explanation of why the $25,000 income from the trust created under the will of Joseph R. Wilson was not reported.This trust also provided for "periodic" distribution of income to each child after that child reached 21. The life beneficiary of this trust income died in July 1968.↩
*. Judith Wilson married after her father's death.↩
4. The adjustments other than the two above set forth, as well as additional issues raised in the petition, have been abandoned or disposed of by agreement of the parties. The issue between the parties as to whether the University of Rochester annuity and certain real property are part of the probate estate apparently concerns whether these funds are expressly burdened with payment of estate and inheritance taxes under decedent's will.↩
5. SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. (b) Application of General Rule.--If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment); but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.↩
6. Petitioner in its brief argues that under the 1966 will the trusts for Mr. Wilson's children would have a corpus of only about $2,600,000. However, this record, including computations made for Mr. Wilson by his Washington attorneys, clearly shows that Mr. Wilson thought that the corpus of the trusts would be substantially greater than $2,600,000 and in fact the indication is that the $12 million of gifts in trust made in 1969 was thought by Mr. Wilson to be approximately the amount which would otherwise go under his will to his children plus the estimated estate tax saving after reduction by gift tax to be paid.↩
7. The resolution of this issue is of vital importance to the parties because of the great increase in estate tax liability that would result from the exoneration of the 1969 trusts. If the funds listed in Article Twenty-First of Mr. Wilson's will bear the tax caused by the inclusion of the 1969 trusts in his gross estate, amounts that would otherwise be deductible as bequests to a charity or surviving spouse would be used to pay the tax. These amounts would then no longer be eligible for deduction and would further increase the taxable estate, requiring further invasion of the deductible funds and increase of the taxable estate, and so on. The ultimate result of this progression is that what would otherwise be an estate tax liability of approximately $4 million if payable from nondeductible funds would become an estate tax liability of approximately $19 million.↩
8. TWENTY-FIRST: I direct that all estate, inheritance or other death taxes which may be assessed against the property passing under this Will or against any insurance proceeds and other property which may be subject to such taxes shall be paid from my residuary estate, and to the extent that my residuary estate may be insufficient to pay in full the aforesaid taxes, I direct that said taxes shall be charged first against the legacy to THE UNIVERSITY OF ROCHESTER under Article SIXTH and to the extent its assets are insufficient, then against the trust legacy for the benefit of my wife established under Article SEVENTH hereof, and to the extent its assets are insufficient, then against the other legacies provided for in my Will; but in particular, I direct that no part of (1) said taxes (including any interest and penalties thereon) imposed by any jurisdiction whatsoever by reason of my death upon or with respect to any property included in my estate for the purpose of any such taxes, whether such property passes under or outside, or has passed outside, the provisions of my Will, or (2) any debts of or charges or claims against my estate of any type or description (including funeral or administration expenses of my estate) shall be allocable to or paid from, in whole or in part, the assets of a certain trust dated the 4th day of August, 1965, between me as Grantor and United States Trust Company of New York as Trustee.↩